# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1166

_____

United States of America,

           Appellee,

    v.

Twyla Esther Brown, also known
as Twyla Demarce,

           Appellant.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

Appeal from the United States
District Court for the
District of North Dakota.

_____

Submitted: October 22, 2003
Filed: March 11, 2004

_____

Before BYE, HANSEN, and MELLOY, Circuit Judges.

_____

HANSEN, Circuit Judge.

Twyla Brown, who was convicted of assaulting her foster child, K.D., appeals her conviction, arguing that there was insufficient evidence to support the jury's verdict and that the government violated her due process rights by withholding medical records. We affirm the judgment of the district court.[1]

_____

[1]The Honorable Rodney S. Webb, United States District Judge for the District of North Dakota.

## I. Facts and Background

Brown is member of the Spirit Lake Nation and resides on its reservation in Fort Totten, North Dakota. In September 2001, Brown became foster parent to K.D., a fourteen-month-old boy. On October 11, 2001, K.D. suffered serious brain injuries as a result of shaken baby syndrome.[2] Brown was ultimately charged with assaulting K.D., in violation of 18 U.S.C. §§ 113(a)(6) and 1153 (2000).

On the morning of October 11, 2001, Brown had an appointment at a clinic in Devils Lake, North Dakota, to have her blood drawn. Her sister, Larina Bugg, picked her up from her home at about 9 A.M. and drove Brown, Brown's three-year-old son, and K.D. to the clinic. Bugg, the three-year-old, and K.D. remained in the car while Brown went inside the clinic. Once inside, Brown saw her nephew, Stephen Brown. When Stephen learned that Bugg was outside in her van with K.D., Stephen went outside to the van. Stephen held and played with K.D. until Twyla Brown came back out of the clinic. Stephen testified at trial that K.D. did not cry or fuss while Stephen was in the van. Bugg and Brown then returned to the reservation. Bugg testified that when they were about ten minutes away from Brown's home on the reservation, K.D. began to cry and cried for the rest of the ride.

Brown returned to her house between 10:30 and 10:45 A.M. At about 11:05 A.M., Brown claims that she noticed that something was wrong with K.D. She called out to him and shook him, but he was unresponsive. Brown went to a neighbor's house to call an ambulance. The ambulance arrived at about 11:10 A.M.

---

[2]Shaken baby syndrome is a traumatic brain injury suffered by infants as a result of severe shaking. Brown stipulated at the beginning of the trial that the injury K.D. suffered was a result of shaken baby syndrome. (Trial Tr. Vol. I at 7.)

At trial, the government argued that the injury had occurred immediately or shortly before Brown called the ambulance. The time frame is significant because only Brown had control over the infant between the time that Bugg dropped Brown off at Brown's home and the time that Brown called the ambulance. Brown's theory was that the injury could have happened in the days or hours before she found K.D. unresponsive and limp, and during that wider time frame, other people, including Bugg, Stephen Brown, and Bugg's son, Terrence Bugg, had control over K.D.

Vince Compeau, the responding paramedic, testified at trial that K.D. was unconscious and was not breathing when he arrived at Brown's door. When Compeau spoke with Brown, she told him that K.D. had been fine all morning and had been eating in his high chair when she found him slumped over and unresponsive. He further testified at trial that K.D. regained consciousness shortly before arriving at the emergency room at Mercy Hospital in Devils Lake, North Dakota.

When K.D. arrived at Mercy Hospital, he was intubated, and computer augmented tomography scans ("CT scans") were taken. Several doctors examined K.D. Dr. Anthony Rayer, an emergency room doctor at Mercy Hospital, testified at trial that when K.D. arrived at the hospital at about 11:30 A.M., K.D. remained unresponsive and comatose, or almost comatose. Dr. Rayer testified that K.D.'s neurological exam was not normal, and he made arrangements to transfer K.D. to a facility in Fargo that was better equipped to deal with the type of trauma that K.D. exhibited. Dr. Rayer also testified that when he spoke to Twyla Brown, she told him that K.D. had been fine that morning. She told Dr. Rayer that she had left her home in order to make a phone call, and on her return, she had found K.D. unresponsive. (Trial Tr. Vol. II at 160.)

K.D. was transported to MeritCare Hospital in Fargo, North Dakota, where he underwent surgery and additional CT scans were taken. Dr. Ron Miller, a pediatrician who treated K.D. at MeritCare, testified at trial that K.D. had suffered a

combination of injuries: subdural hematoma, massive cerebral edema, subarachnoid bleeding, and diffuse axonal injury. Dr. Miller testified that it would have been impossible for K.D. to have behaved normally after suffering such injuries. He testified that the diffuse axonal injury, especially, would have been immediately symptomatic, such that those interacting with K.D. would have immediately known that something out of the ordinary was wrong. Dr. Miller also testified that, after incurring such injuries, K.D. would not have been able to sleep, play, eat, cry, or throw a tantrum like a normal, fourteen-month-old toddler. Thus, Dr. Miller opined that K.D. had incurred the injuries after the last time that he was reported to have been behaving normally, and likely shortly before the ambulance was called. (Trial Tr. Vol. II at 129-31.)

Dr. Wilbur Smith, the government's expert testified to the same combination of injuries that Dr. Miller recounted. (Trial Tr. Vol. III at 95-97.) He further testified that, considering the several injuries, K.D. would not have behaved normally on the morning of October 11 if he had already incurred such injuries. Finally, Dr. Smith also testified that the diffuse axonal injury would have been immediately symptomatic, which means that the injury must have occurred shortly before K.D. was found unresponsive and comatose.

During the investigation following K.D.'s injury, Brown was questioned numerous times about the events of October 11. Brown gave several statements to Federal Bureau of Investigation agent Michael Wilson, and her statements about the minutes preceding K.D.'s injury varied. In her first statement to Wilson on October 11, Brown stated that Bugg had reported that K.D. had thrown a fit while Brown was inside the clinic, and that K.D. was crying when they left the clinic in Devil's Lake. Brown said that when she got home, she placed K.D. on the couch, and shortly thereafter she went to a neighbor's house to make a call about her septic system. She also told Wilson that K.D. was crying when she left, but when she returned, he was quiet, his eyes were open, and he was shaking. Then he went limp. She said that she

4

shook him gently to try to wake him up, but he was unresponsive. She then allegedly went back to her neighbor's to call for help. (Trial Tr. Vol. II at 194-97.)

When Wilson interviewed Brown a second time on November 29, 2001, Brown said that K.D. had behaved normally and did not cry on the way home from the clinic on October 11. This time she said that K.D. was fine when she went to a neighbor's house to use the phone (not crying, as he was in her earlier statement), and when she returned to her home, K.D. was on the couch playing and still doing fine (not shaking, as in her earlier statement). She said that she returned to cooking, but when she went back to look at him, K.D. was shaking. (Trial Tr. Vol. II at 203-06.) Brown signed and initialed this statement.

When Wilson took a statement from Brown on July 1, 2002, she again said that K.D. was happy and healthy on the morning of October 11, 2001. This time she also told Wilson that when she walked out of the clinic and got in the van, K.D. was fine. He did not cry and was awake. She said that K.D. also behaved normally and did not cry on the way home. In this version of the story, however, Brown said that she immediately observed K.D. shaking and not responsive when she returned from her neighbor's house. She shook him softly, but he did not respond. In this version of the events, when Brown went to call an ambulance,. K.D. was still shaking, not limp as she had told Wilson on October 11, 2001. (Trial Tr. Vol. II at 216-19.) Brown also signed and initialed this statement.

Brown was charged in June 2002, a jury convicted her in early October 2002, and she now brings the present appeal.

## II. Insufficient Evidence Claim

Brown argues that insufficient evidence supported her conviction because the evidence presented by the government did not establish proof beyond a reasonable

5

doubt that she injured K.D. We review the sufficiency of the evidence issues de novo, and "we view the facts in the light most favorable to the verdict and resolve conflicts in favor of the verdict; we will sustain the verdict if, based on our review, a reasonable jury could have found the defendant guilty of the charged conduct beyond a reasonable doubt." United States v. Espinoza, 349 F.3d 525, 528-29 (8th Cir. 2003). We disagree with Brown, and we hold that sufficient evidence supported her conviction. "We think it self-evident from our recounting of the evidence presented that there was more than enough evidence from which a reasonable jury could have determined that [Brown] was guilty beyond a reasonable doubt." Id. at 529.

Brown's theory was that there were others who had control over K.D., and who could have inflicted the injuries. However, Larina Bugg, her fourteen-year old son Terrence Bugg, and Stephen Brown all testified that they did not injure K.D. The jury was free to believe their testimony and to find no merit in Brown's assertion that one of her relatives harmed the baby. The government also presented evidence of the conflicting accounts given by Brown, and that evidence may well have affected her credibility in the jury's eyes. Furthermore, Dr. Miller and Dr. Smith testified that they believed the injuries were inflicted shortly before the 911 call at 11:05 A.M. While Brown's expert did testify that he did not think that it was reasonable to restrict the onset of the injuries to a specific time frame, he nevertheless admitted that it was possible that the injury occurred between 10:30 and 11:05, as the government argued. (Trial. Tr. Vol. III at 58, 60.) The jury was free to credit each expert's opinion accordingly. After a careful review, we conclude that there was sufficient evidence for the jury to find beyond a reasonable doubt that K.D. was injured shortly before the paramedics were called to the scene, and that Brown was the only person who had control over him at that time.

## III.  Brady Violation.

Brown argues that the government violated <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), when it withheld from the defense certain CT scans taken at MeritCare Hospital before K.D.'s operation.   <u>Brady</u> holds that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Id.</u> at 87. It appears doubtful that Brown properly presented this argument to the district court, thus preserving it for appellate review.[3]   However,  assuming that Brown preserved her argument, we hold that Brown has failed to set out a <u>Brady</u> violation.

"To prove a <u>Brady</u> violation, a defendant must show that the prosecution suppressed the evidence, the evidence was favorable to the accused, and the evidence was material to the issue of guilt or punishment." <u>United States v. Duke</u>, 50 F.3d 571,

---

[3]Brown made a motion for a new trial based on Federal Rule of Criminal Procedure 33 but did not make a <u>Brady</u> allegation in that motion.  In fact, the only thing that Brown says about a missing CT scan in that motion is that "Defendant's [sic] also argues that the missing CT scans may have been necessary to providing proper medical examination of the case at bar. Furthermore the CT scan's [sic] that were made available were only done so after the trial had begun." (Dist. Ct. R. at 118.)   From those lines, the district court was apparently to infer that there were additional CT scans that were not made available to the defense.  The inferred allegation was not likely sufficient to submit a <u>Brady</u> claim to the district court.  <u>See</u> <u>United States v. Keltner</u>, 147 F.3d 662, 673 (8th Cir.) ("[The defendant] did not state the issue as being whether the government violated the principles set forth in <u>Brady</u>. Defendants failed to obtain a ruling on this issue by the District Court. The <u>Brady</u> issue has not been preserved for appellate review.") (internal citation omitted), <u>cert. denied</u>, 525 U.S. 1032 (1998).

577 (8th Cir.), cert. denied, 516 U.S. 885 (1995). "Evidence is 'material' for the purpose of the rule in Brady 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different.'" Id. (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)). In this case, Brown does not allege the facts necessary to prove a Brady violation.

Brown does not allege that any CT scan was suppressed by the prosecution or that the government had in its possession a CT scan that was not turned over to the defense. To the extent she complains about the late delivery of the CT scans from Mercy, it is clear from the record that these scans were not in the possession or control of the government before trial, and that the government turned them over to the defense as soon as the government received them. Instead, Brown appears to argue that there was another CT scan that may have helped her case. She does not allege what this CT scan might have shown or even that it definitely exists. Brown's belief does not establish that any such CT scan contained exculpatory or impeachment evidence, see United States v. Wadlington, 233 F.3d 1067, 1076 (8th Cir. 2000), cert. denied, 534 U.S. 1023 (2001), or, if any scan did exist, that it was suppressed by the prosecution, see United States v. Van Brocklin, 115 F.3d 587, 595 (8th Cir. 1997), cert. denied, 523 U.S. 1122 (1998). Her speculation is not enough. We have held that the "[m]ere speculation that materials may contain exculpatory evidence is not . . . sufficient to sustain a Brady claim." Id. at 594.

For the reasons stated, we affirm Brown's conviction and the judgment of the district court.

_____