# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-2319

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of South Dakota. |
| Ursula Red Bird, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: December 12, 2005
Filed: June 15, 2006

_____

Before MELLOY, COLLOTON, and BENTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

In a prosecution based on the death of Ursula Red Bird's infant son, a jury convicted Red Bird of an assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 113(a)(6) and 1153. The district court[*] sentenced her to 67 months' imprisonment and three years' supervised release. Red Bird challenges the sufficiency of the evidence, the court's decision to admit evidence of her violation of conditions of pre-trial release as evidence of flight, and the court's two-level

_____

[*]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

adjustment for obstruction of justice under the advisory sentencing guidelines. We affirm.

I.

Red Bird is the mother of three children. On December 14, 2003, she was with her two infant sons in her apartment. Shortly before noon, Red Bird entered a neighbor's residence, saying that her baby, J.B., had fallen down the stairs, and asking to use the telephone. She called a local health clinic to report an injury to J.B., but, according to witnesses from the clinic, she declined several offers to send an ambulance to assist. Red Bird then drove J.B. to the clinic, but J.B. died later that afternoon. When she was interviewed later, Red Bird stated that J.B. was left alone in a bathroom while Red Bird attended to another child, that Red Bird heard a loud "thud" come from the bathroom, and that Red Bird returned to the bathroom to find J.B. unresponsive with his eyes rolled back in his head.

A pathologist performed an autopsy, and concluded that J.B. died as a result of traumatic injury to the head and brain. On March 18, 2004, a grand jury returned an indictment charging Red Bird with second degree murder, in violation of 18 U.S.C. §§ 1153 and 1111. The government later filed a superseding indictment to include a count for assault resulting in serious bodily injury, in violation of 18 U.S.C. §§ 1153 and 113(a)(6).

On March 24, 2004, Red Bird was arraigned and released, subject to court-ordered conditions of release. One condition of release required her to reside with her grandmother, Violet Points At Him, who was her appointed third-party custodian. Red Bird was directed to report biweekly to her probation and pretrial services officer, Linda Sack. Between March 24, 2004 and May 13, 2004, Red Bird abided by her supervised release provisions.

On May 13, Red Bird telephoned Sack and left her a voice message indicating she was traveling to Rapid City, South Dakota, for an eye appointment. Sack phoned back and left a voice message for Red Bird to call back. Sack received no response, and during the next two weeks, she made about a half-dozen calls to Red Bird's home, called Red Bird's employer, mailed a letter to Red Bird's post office box with instructions to call her, and made a personal visit to Red Bird's home, where she taped a business card with instructions to call on Red Bird's door. Red Bird nonetheless made no contact with Sack. On June 4, 2004, Sack filed a Report of Apparent Bond Violation, and the court issued a warrant for Red Bird's arrest. After the warrant was issued, federal law enforcement officers and Rosebud Sioux Tribe police officers made further attempts to find Red Bird, all unsuccessful. On August 10, 2004, a Rosebud Sioux Tribe Special Agent fortuitously discovered Red Bird at the Rosebud Indian Health Service receiving treatment for a car accident. The agent, who was at the health clinic for an unrelated matter, arrested Red Bird.

At trial, the court permitted the government to introduce evidence of Red Bird's bond violation as evidence of flight from which the jury could infer consciousness of guilt. The court also allowed the government to argue to the jury that it could infer consciousness of guilt from Red Bird's bond violation, but declined to give a jury instruction on that inference. After Red Bird was convicted, the district court applied a two-level adjustment under the advisory sentencing guidelines for obstruction of justice, based on her bond violation. As a result, the advisory guideline range was 57-71 months' imprisonment, and the court imposed a term of 67 months.

II.

Red Bird appeals the sufficiency of the evidence presented by the government to support her conviction. Specifically, she observes that the government's theory of prosecution was that Red Bird killed J.B. by shaking the child, but argues that the evidence failed to show that a person could have shaken J.B. with enough force to

-3-

cause his injuries. Separately, she argues even if there was evidence to support a finding that J.B. may have died from a traumatic injury to the head consistent with shaken baby/shaken impact syndrome, the government did not prove beyond a reasonable doubt that Red Bird caused those injuries. When reviewing for sufficiency of the evidence, we must "determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt," viewing the evidence in the light most favorable to the government, *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979), and "accepting all reasonable inferences drawn from the evidence that support the jury's verdict." *United States v. Blazek*, 431 F.3d 1104, 1107 (8th Cir. 2005) (internal quotation omitted).

Red Bird was convicted of assault resulting in serious bodily injury, in violation of 18 U.S.C. § 113(a)(6). "Serious bodily injury" is bodily injury which involves a substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the functions of a bodily member, organ, or mental faculty. 18 U.S.C. § 1365(h)(3); *see* 18 U.S.C. § 113(b)(2).

The evidence relied upon by the government in support of the conviction was primarily medical evidence from expert pathologists, and evidence of statements by Red Bird concerning the circumstances of the injury to J.B. We conclude that the totality of the evidence, taken in the light most favorable to the verdict, is sufficient to support the jury's conclusion.

The pathologist who conducted the autopsy, Dr. Donald Habbe, testified that J.B. had suffered traumatic injury to the brain, described as subdural hematomas and subarachnoid hemorrhaging. Dr. Habbe also observed retinal hemorrhaging in both eyes, which he believed was consistent with trauma to the head, and he found no evidence of external trauma to the head which could have caused the subdural hematomas. Dr. Habbe testified that his findings concerning J.B.'s condition were

-4-

consistent with the diagnosis of shaken baby/shaken impact syndrome. (T. Tr. at 466-67).

Elaborating on that condition, Dr. Habbe explained that there is difference of opinion in the medical community about whether a baby can be shaken hard enough, without any impact, to cause serious brain injuries and death. He related that some experts believe that violent shaking can cause brain injury and death. Others believe that some impact accompanying the shaking is necessary to produce such an injury, but that experts in that group believe it is possible to conclude that impact occurred even if there is no visible impact site on the child's scalp. In Dr. Habbe's opinion, J.B. suffered head trauma as a result of violent shaking, either with or without impact, and that if there was impact, he could not tell that it happened based on his physical examination of the body. (T. Tr. at 487). He opined that the head injuries suffered by J.B. were not consistent with Red Bird's explanation that she left the boy in a bathroom, heard a thud, and returned to find the boy with his eyes rolled back in his head. (*Id.* at 486-87).

An assistant medical examiner from Minneapolis, Dr. Daniel Davis, was called by the defense and also testified concerning J.B.'s injuries, based on his review of records and photographs accumulated by Dr. Habbe. Dr. Davis explained that shaken baby/shaken impact syndrome describes a case in which a "small child is violently shaken to and fro probably multiple times with the result being shearing injury to the brain itself as a result of the brain trying to catch up. . . . As a result of that[,] portions of the deep brain are functionally torn." (T. Tr. at 421). Dr. Davis testified that there is division in the medical community about whether serious brain injury can be caused "just by shaking," or whether "an impact is required in order to deliver that much force to the brain," but opined that "the majority of the medical community agrees that inflicted injury to the head, acceleration, deceleration trauma is very bad for the baby or infant brain." (*Id.* at 422). Because Dr. Davis also found evidence that J.B.

suffered from pneumonia, he ultimately testified that he did not know whether the exact cause of death was head trauma or pneumonia. (*Id*. at 433).

A third expert, Dr. Janice Ophoven, who was retained by the defense, testified that in her opinion, a child of J.B.'s age cannot suffer traumatic brain injury serious enough to develop symptoms and die by virtue of shaking alone, and that there must be evidence of impact. (T. Tr. at 531). Dr. Ophoven's written report, based on her examination of records and photographs, opined that J.B. suffered no subdural hematoma. At trial, she testified that her report was "missing a word" – "acute" – and that her opinion was that J.B. had suffered no "acute trauma," meaning that there was "no fresh hematoma." (*Id*. at 537-38).

The government also presented evidence that Red Bird gave conflicting statements concerning the circumstances of J.B.'s injury, including her statement to the neighbor that J.B. fell down the stairs, her statements to hospital workers that she left J.B. in the bathroom and then heard a "thud," and a statement to a deputy coroner that J.B. had gone into the bathroom alone and then fallen. It was also undisputed that Red Bird was the only adult in the apartment with J.B. at the time of the incident. Addressing the death of J.B., Dr. Davis said "the findings that we have of subdural, subarachnoid hemorrhage, sudden onset in the presence of a single caretaker requiring . . . hospitalization immediately after, if that is the overwhelming problem, then we really have to consider homicide." (T. Tr. at 420).

This evidence was sufficient to support the jury's verdict. The testimony of Dr. Habbe and Dr. Davis provided ample grounds to believe that J.B. suffered serious injury to the brain while in Red Bird's sole custody, and that it was caused by shaken baby/shaken impact syndrome. While there was disagreement about whether the brain injury, rather than pneumonia, could be declared definitively the cause of death, the jury convicted Red Bird only of assault causing serious bodily injury, not homicide. Evidence that Red Bird gave changing statements about the circumstances  of the

-6-

incident – shifting from a fall down the stairs to a "thud" in the bathroom – also supports an inference that she was seeking to develop an explanation to cover up her own misconduct in causing injury to J.B. The jury was entitled to discredit Dr. Ophoven's testimony as inconsistent with that of the other experts, and in light of impeachment evidence elicited by the government. We thus conclude that there was sufficient evidence to prove beyond a reasonable doubt the offense of assault resulting in serious bodily injury.

### III.

Red Bird contends that even if there was sufficient evidence to sustain her conviction, the district court abused its discretion by permitting the government to present evidence at trial that she violated her conditions of pre-trial release. The government theorized that Red Bird's failure to maintain contact with her probation officer amounted to "flight," and the jury could infer consciousness of guilt from this flight. We have said that the probative value and admissibility of flight evidence depends on the degree of confidence with which the fact-finder can draw four inferences: from the defendant's behavior to flight; from flight to consciousness of guilt; from consciousness of guilt to consciousness of guilt concerning the crime charged; and from consciousness of guilt concerning the crime charged to actual guilt of the crime charged. *United States v. Hankins*, 931 F.2d 1256, 1261 (8th Cir. 1991); *see also United States v. Chipps*, 410 F.3d 438, 449-50 (8th Cir. 2005).

We believe the relevance of the pre-trial release violation to Red Bird's consciousness of guilt was questionable under the circumstances of this case. Red Bird's failure to maintain contact with the probation office did not result in her absence from any court appearances, and there was no evidence that she left the general area where she was authorized to reside and work. There was not a strong inference that she was seeking to "flee" from authorities in a way that demonstrates consciousness of guilt. *Cf. United States v. Urbina*, 431 F.3d 305, 310 (8th Cir. 2005)

(flight from law enforcement agents during attempted controlled delivery following arrest); *United States v. Hankins*, 931 F.2d at 1261-62 (escape from jail prior to trial). Although the district court did continue the trial after Red Bird was apprehended, the stated reason for the continuance was that "despite the exercise of due diligence, defense counsel requires additional time to properly investigate and prepare for trial," not Red Bird's violation of her conditions of release.

We conclude, however, that any error in admitting the evidence was harmless, because we do not think the evidence substantially influenced the outcome of the trial. *See Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946). The bulk of the evidence involved medical testimony and circumstantial evidence as to whether Red Bird injured her son. The government presented a relatively modest amount of testimony concerning its inability to contact Red Bird between May 13 and August 10, 2004. After hearing the evidence, the district court declined to instruct the jury on inferring guilt from Red Bird's bond violation, stating "I'm just not going to highlight it by the Court's Instructions." (T. Tr. at 557). And during closing arguments, the government resorted only to rhetorical questions when framing the evidence of bond violations, not once arguing directly to the jury that it could infer consciousness of guilt from Red Bird's behavior. (*Id*. at 601-03). Under these circumstances, we think it unlikely that the evidence had a substantial influence on the outcome, *see Kotteakos*, 328 U.S. at 765, and any error was therefore harmless.

## IV.

Red Bird also appeals her sentence, arguing that the district court erred in imposing a two-level adjustment for obstruction of justice pursuant to United States Sentencing Guidelines § 3C1.1 under the advisory sentencing guidelines. There is no dispute about the relevant facts, and we review *de novo* whether § 3C1.1 applies to a defendant's specific conduct. *United States v. Thomas*, 72 F.3d 92, 93 (8th Cir. 1995).

We have some doubt about the government's position that Red Bird's bond violation was comparable to an "escape" from custody, for which an obstruction adjustment is authorized. *See* USSG § 3C1.1, comment. (n.4(e)). Our precedents upholding obstruction adjustments for bond violations involved flight to California between conviction and sentence, *United States v. Shinder*, 8 F.3d 633, 635 (8th Cir. 1993), and a defendant who "absconded" for three-months in an undefined manner after pleading guilty, where we relied on authorities involving flight from the jurisdiction. *Thomas*, 72 F.3d at 93. We find it unnecessary to decide whether § 3C1.1 should be extended to the facts of Red Bird's bond violation, because the district court made clear that it would impose the same sentence based on the considerations in 18 U.S.C. § 3553(a), whether or not the two-level adjustment applied under the advisory guidelines. We believe such a sentence is not unreasonable with regard to § 3553(a), and we thus conclude that any error in the guideline computation was harmless. *See United States v. Hadash*, 408 F.3d 1080, 1083 (8th Cir. 2005).

A review of a sentence imposed after *United States v. Booker*, 543 U.S. 220 (2005), involves a two-step inquiry: first, an examination of whether the district court applied and interpreted the guidelines correctly, and second, a determination whether the ultimate sentence was reasonable in light of 18 U.S.C. § 3553(a). *United States v. Mashek*, 406 F.3d 1012, 1016-17 (8th Cir. 2005). The district court in this case calculated the advisory guideline range to be 57 to 71 months' imprisonment, counting the two-level obstruction adjustment, but 46 to 57 months' imprisonment if the adjustment were excluded. (S. Tr. at 23). Then, "taking into account the advisory sentencing guidelines and all the factors set forth in 18 United States Code, Section 3553," (*id.* at 25), the court imposed a term of 67 months' imprisonment, and said "*that's the sentence that I would have imposed whether or not I added points for obstruction of justice.*" (*Id.* at 26) (emphasis added). Assuming there was error in applying the adjustment, therefore, we must determine whether the court's 67-month

sentence was reasonable with regard to § 3553(a), given an advisory guideline range of 46 to 57 months' imprisonment.

At sentencing, the court explained that "I always take into account in the course of sentencing somebody what their pre-trial conduct has been. And in this instance, the defendant's pre-trial conduct was bad." (S. Tr. at 26). This "bad" conduct involved Red Bird's failure to contact her probation officer for approximately three months, despite a court order requiring regular contact and repeated efforts by the probation office and law enforcement officers to find her. According to the court's alternative sentence, Red Bird's pre-trial conduct warranted an upward variance of ten months from the maximum sentence under the advisory guideline range, as computed without the obstruction adjustment.

We believe the district court's consideration of Red Bird's pre-trial conduct was appropriate under § 3553(a), because it is relevant to the history and characteristics of the defendant, and to the need for the sentence imposed to promote respect for the law. 18 U.S.C. §§ 3553(a)(1), (a)(2)(A). We also conclude that a variance from a 57-month sentence at the top of the advisory range to a term of 67 months is reasonable with regard to § 3553(a). Even if Red Bird's bond violation did not amount to obstruction of justice, *Booker* permits the district court to give weight to factors under § 3553(a) that were not countenanced under the mandatory guidelines. Misconduct while on pre-trial release is relevant to whether the defendant is likely to conform to societal norms when released from prison, and it is not unreasonable for a district court to conclude that a sanction for such misconduct may promote respect for the law.

A variance of ten months from the advisory guideline range, under the district court's alternative scenario, is an increase of less than 20 percent over the top of the applicable range. It is not the sort of dramatic increase that we have said requires extraordinary reasons before it will be deemed reasonable. *Cf. United States v.*

*Kendall*, 446 F.3d 782, 784-85 (8th Cir. 2006). Although the need to avoid unwarranted sentence disparities is one factor that must be considered by a district court after *Booker*, 18 U.S.C. § 3553(a)(6), we nonetheless cannot say that a variance of the magnitude adopted by the district court under the circumstances of this case is "unreasonable" with regard to § 3553(a) as a whole.

\*       \*       \*

For the foregoing reasons, we affirm the judgment of the district court.

_____