# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-2585

_____

United States of America

*Plaintiff - Appellant*

v.

James White, Jr.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: February 12, 2015
Filed: July 23, 2015

_____

Before GRUENDER, SHEPHERD, and KELLY, Circuit Judges.

_____

GRUENDER, Circuit Judge.

A jury found James White, Jr., guilty of assault resulting in serious bodily injury in Indian country in connection with injuries suffered by his ten-month old son, A.W. *See* 18 U.S.C. §§ 113(a)(6), 1151, 1153(a). The district court then granted White's motion for judgment of acquittal, concluding that no reasonable juror could find beyond a reasonable doubt that White intentionally assaulted A.W. during a ten-

minute period when the two were alone. The Government appeals. We reverse and remand with instructions to reinstate the jury's guilty verdict. *See United States v. Boesen*, 491 F.3d 852, 853 (8th Cir. 2007).

## I. Background

On August 30, 2013, ten-month old A.W. lived with his mother, Cheryl Maxwell; his father, James White, Jr.; his brother, X.W.; and his three half-siblings, L.S., J.S., and J.L.S. At A.W.'s five-month check-up with his pediatrician, A.W. had been a "perfectly healthy, thriving infant." And at his nine-month visit, A.W. had been developing normally and meeting all age-appropriate milestones.

That changed on August 30, 2013. A.W. spent that day at home with Maxwell, White, X.W., L.S., and J.S. L.S. and J.S. played inside and outside of the house, and A.W. and X.W. stayed inside with Maxwell and White. Maxwell testified that she "always" kept A.W. with her. The only time before dinner on August 30 that Maxwell could not account for A.W. was when she showered. Maxwell observed that A.W. acted normally throughout the day; he was, as she put it, his "usual self." He was not fussy and did not "cry out" at any time. Around 5:00 p.m., the family ate dinner together. Maxwell made hamburger and rice soup, which everyone, including A.W., ate. During dinner, A.W. continued to act normally. He was not fussy or crying, and he did not appear to be ill. After dinner, A.W. became tired, and White told Maxwell that he would put A.W. to bed.

Maxwell decided to walk to her cousin's house to get a ride to the store. She took X.W., L.S., and J.S. with her, leaving A.W. alone with White. Maxwell testified that nothing seemed out of the ordinary when she left. Maxwell and the other children returned approximately ten minutes later. White met them at the door with A.W. in his arms and told Maxwell that A.W. was choking. When Maxwell saw A.W., his eyes were "rolled back," and he had "a little bit of rice coming out of his

mouth and a little bit out of his nose." White told her that he had found a cigarette filter in A.W.'s mouth. Maxwell called 9-1-1 as White performed CPR.

Officer Guadalupe Ybarra and Officer Dana Lyons responded to the 9-1-1 call. White told Officer Ybarra that A.W. was choking, but White "didn't know if it was a cigarette butt or the hamburger . . . that [A.W.] had been fed earlier." When Officer Lyons arrived, White stated that A.W. was eating hamburger and rice and that "all of a sudden [A.W.] started choking and he stopped breathing." White further explained that he had tried to "get the object out of [A.W.'s] throat." The officers looked for choking hazards on the floor. They saw none. Officer Ybarra instead observed that the home was fairly clean. Maxwell confirmed that she recently had cleaned the house. The officers also checked what they could see of A.W.'s body for injuries. Neither officer saw any bruising, including on A.W.'s ears. While they waited for an ambulance to arrive, Officer Lyons performed back thrusts on A.W., and White gave him rescue breaths.

Maxwell accompanied A.W. to the local hospital, where he was seen by Dr. Randall Fryer. Dr. Fryer immediately requested a helicopter to take A.W. to a hospital that could provide more care. Dr. Fryer observed that A.W. was seizing, was breathing irregularly, had unequal pupils, and had extensor posturing, which means that his arm was extended and stiff. Extensor posturing, Dr. Fryer explained, can indicate an injury at the deepest part of the brain. Dr. Fryer feared that A.W. was going to die.

In examining A.W., Dr. Fryer noticed a "yellowish brown" bruise on A.W.'s forehead, which Dr. Fryer thought was an old bruise. Maxwell stated that the bruise came from a sibling throwing something that struck A.W. Dr. Fryer also observed almost symmetrical bruising near the base of A.W.'s ears. Dr. Fryer estimated that this bruising was hours or minutes old based upon its color. Maxwell reported that the bruising on A.W.'s right ear was from a fall the day before. Based upon the

seriousness of A.W.'s condition, the symmetry of the bruising at the base of his ears, his extensor posturing, his low neurological score, and his non-responsiveness, Dr. Fryer believed that A.W. had been "shaken."

A.W. was taken to Sanford Medical Center in Fargo, North Dakota. After seeing the trauma team, A.W. was seen by Dr. Kenneth Gheen, a pediatric critical-care physician. When Dr. Gheen examined A.W., he noted "obvious bruising" on A.W.'s head. Dr. Gheen also reviewed A.W.'s CT scan from the emergency room, which showed a brain hemorrhage and a "little bit" of swelling.

A.W.'s medical team in Fargo also included Dr. Adam Jackson, a neurosurgeon. From his review of A.W.'s CT scans, Dr. Jackson saw acute blood between the lobes of A.W.'s brain as well as between the skull and the brain on the right side of A.W.'s head. Dr. Jackson testified that acute blood is deposited between three hours and three days of a CT scan. Dr. Jackson characterized the acute blood on A.W.'s brain as a subdural hematoma. According to Dr. Jackson, "in a young child, a spontaneous subdural hematoma is exceedingly rare, even in the literature, and so the most likely explanation is trauma." Dr. Jackson explained that although blood on the brain can collect slowly, that usually happens in older adults.

After reviewing A.W.'s MRI and examining him, Dr. Jackson also concluded that A.W. had an underlying brain injury as opposed to mere pressure on his brain. According to Dr. Jackson, A.W.'s MRI showed a lack of blood flow to part of his brain, which "can be from cortical injury or pressure on the brain. And in this case, from cortical injury." Dr. Jackson gave two reasons for this conclusion. First, a child A.W.'s age still has an anterior fontanel, the "baby soft spot," that can be felt to determine pressure in the head. In A.W.'s case, the anterior fontanel was not tense, meaning that the pressure in his head was not high. Second, Dr. Jackson explained that A.W.'s CT scan showed patterns that did not indicate high pressure.

-4-

Dr. Arne Graff, a child-abuse specialist, also became involved in A.W.'s care. Dr. Graff spoke with Maxwell and White, examined A.W., and reviewed A.W.'s medical records. Dr. Graff concluded that his "best estimate" of and the "most likely" cause of A.W.'s condition is what is known as a rotational or an acceleration-deceleration injury. This type of non-accidental trauma, Dr. Graff recounted, used to be known as shaken baby syndrome. Although Dr. Graff acknowledged that an impact injury can accompany an acceleration-deceleration injury, he explained that doctors now know that "there is an acceleration and a quick deceleration [of the head] that then results in a tear in vessels and can result in . . . eye injuries and can result in brain injury, nerve injury." If an acceleration-deceleration injury is significant enough, "the person, particularly in kids under the age of two, . . . they stop breathing and they lapse into unconsciousness almost immediately."

Dr. Graff explained why a non-accidental acceleration-deceleration injury was the most likely cause of A.W.'s condition. Dr. Graff observed that A.W. had bleeding on the back walls of his eyes, known as retinal hemorrhaging. This bleeding infiltrated multiple layers of A.W.'s eyes. According to Dr. Graff, even children who fall "a couple stories out of a window and hit the sidewalk or something" exhibit limited, dot-and-blot hemorrhaging. By contrast, when blood permeates multiple layers of a child's eyes, there are only a few potential causes. One explanation can be high-velocity car accidents, but even then, only about four percent of children suffer retinal hemorrhaging like A.W.'s. Another cause, according to Dr. Graff, can be acceleration and deceleration of the head. In A.W.'s case, with no family history or reported accident that could have caused this condition, Dr. Graff found the retinal hemorrhaging to indicate an acceleration-deceleration injury.

Dr. Graff similarly concluded that A.W.'s subdural hematoma suggested that an acceleration-deceleration injury caused A.W.'s condition. According to Dr. Graff, with an acceleration-deceleration injury, the resulting subdural hematoma tends to be a "very thin layered" subdural hematoma that extends over the curvature of the brain,

between the lobes of the brain, or in the base of the brain. Dr. Graff testified that A.W.'s subdural hematoma fit this pattern. Dr. Graff contrasted A.W.'s subdural hematoma with that found in a child who merely hits his head. With such an impact injury, a context subdural hematoma can occur "right at the point of impact." Dr. Graff also noted the presence of bruising inside of A.W.'s ears. Dr. Graff could not determine when this bruising occurred, but he explained that bruising inside of someone's ears, particularly for a child who could not yet stand on his own, can suggest an inflicted injury.

Dr. Graff's conclusion that an acceleration-deceleration injury was the most likely cause of A.W.'s condition also took into account conversations with Maxwell and White, both of whom raised concerns about Maxwell's eight-year old son, J.S. Maxwell told the jury about several incidents involving J.S., including that she saw him "throwing a little cat up in the air" and that he may have been present or played a role in the death of dogs who were thrown against a tree. J.S. also knocked out another child's teeth and threw rocks at children. And a social worker testified that, sometime after A.W. was taken to the hospital, J.S.'s sister L.S. had teased him about hurting his younger brother.

Maxwell and White informed Dr. Graff about two specific incidents involving J.S. and A.W., one of which had occurred one or two weeks earlier. A.W. had been in his "Johnny Jumper," a chair suspended from the doorframe, and J.S. "wound it up a little bit and let it twirl." As a result, A.W. hit his head on the doorjamb. Maxwell told Dr. Graff that A.W. had been "perfectly fine" since that time. Moreover, Dr. Graff testified that this incident would not cause injuries as severe as A.W.'s. Dr. Graff also learned about a recent incident where J.S. threw a toy that hit A.W. on the forehead. This act left a small bruise, which Dr. Graff characterized as simple trauma to the skin. Dr. Graff also testified that White raised general concerns about J.S., including about him "potentially choking the infant and dragging him around." But White did not suggest that any such incident had occurred on August 30.

-6-

Maxwell and White also told Dr. Graff about an incident in which White accidentally dropped A.W. while getting him out of the bathtub. This happened one day or so before A.W. was rushed to the hospital. White reported that A.W. hit his chin on the bathtub and that the fall left bruises on A.W.'s chin and shoulder.

These incidents aside, Maxwell told Dr. Graff that A.W. had behaved normally on August 30. Dr. Graff concluded that none of these previous incidents could have caused A.W.'s condition. Dr. Graff testified that, with the extent of A.W.'s injuries, he would expect that "there would have been a change in the infant noticed by the parents." According to Dr. Graff, "[t]he fact that [A.W.] was reported to be down in that brief period of time when he's been doing perfectly fine, then I would expect that whatever caused that injury had to occur just prior to him going down."

The jury also learned about White's behavior after the incident. Maxwell testified that White came to Fargo after A.W. was taken there, arriving after midnight on August 31. However, White went to a hotel, not the hospital, even though the two were adjacent. This prompted an argument between White and Maxwell. As Maxwell put it, "I wanted him to go over there right away to talk to the doctor, but he was tired." Maxwell testified that White came to the hospital around noon. White did not speak with Dr. Graff until about 9:00 p.m. When the two spoke, White informed Dr. Graff that A.W.'s symptoms began after he was moved from his high chair to a car seat and given a bottle.

At trial, White offered the testimony of Dr. Jonathan Arden, a forensic pathologist. Dr. Arden did not speak to A.W.'s doctors or his parents. Dr. Arden concluded that a blunt-impact injury—something striking A.W.'s head or A.W.'s head striking something else—caused A.W.'s condition. And Dr. Arden hypothesized that an incident similar to the "Johnny Jumper" incident involving A.W. could lead to such a blunt-impact injury. Dr. Arden also testified that A.W.'s blunt-impact injury could have occurred well before he exhibited symptoms, most likely

several hours before. This was so, Dr. Arden explained, because A.W. did not have a direct brain injury. According to Dr. Arden, A.W. only suffered a secondary brain injury, meaning that the injury to his brain was caused by pressure from his subdural hematoma. That said, Dr. Arden acknowledged that "[i]f you do have a direct brain injury and you can demonstrate it, that's different. Many of those cases do have rapid development of symptoms."

A.W. ultimately survived. After leaving Sanford Medical Center in mid-September 2013, A.W. was placed into a therapeutic foster home for medically fragile children. With regard to his long-term prognosis, Dr. Jackson explained that "[t]he brain does not regenerate itself, and so injury to [the] brain results in permanent injury, and that can lead to paralysis. It can lead to cognitive deficits depending on the location [of the injury to the brain]."

After hearing this and other evidence, the jury found White guilty of assault resulting in serious bodily injury in Indian country. Although the district court had denied White's motion for judgment of acquittal at the close of the Government's case, the district court granted his post-verdict motion, finding that "justice requires an acquittal." The Government appeals.

## II.    Discussion

The only issue before us is whether the Government presented sufficient evidence for a reasonable jury to convict White. The crime with which White was charged has four elements: "(1) an intentional assault that (2) results in serious bodily injury, committed (3) by an Indian and (4) within Indian Country." *United States v. Stymiest*, 581 F.3d 759, 766 (8th Cir. 2009). The district court found that no reasonable jury could conclude that White intentionally assaulted A.W. We focus our analysis on that issue.

-8-

We review the district court's grant of a judgment of acquittal *de novo*, applying the same standards as the district court. *United States v. Santana*, 524 F.3d 851, 853 (8th Cir. 2008); *Boesen*, 491 F.3d at 855. We therefore do not weigh the evidence or assess the credibility of witnesses; that is the province of the jury. *United States v. Johnson*, 474 F.3d 1044, 1048 (8th Cir. 2007). Instead, we view the evidence in the light most favorable to the jury's verdict and give it the benefit of all reasonable inferences. *Id.* The Government's case need not rule out every reasonable hypothesis except guilt, *Boesen*, 491 F.3d at 858; rather, drawing all reasonable inferences in favor of the verdict, there must be "an interpretation of the evidence that would allow a reasonable minded jury to find the defendant[] guilty beyond a reasonable doubt," *id.* at 856 (alteration in original) (quoting *United States v. Oberhauser*, 284 F.3d 827, 829 (8th Cir. 2002)). This strict standard permits overturning a jury's guilty verdict only if no reasonable jury could find the defendant guilty beyond a reasonable doubt. *Id.* at 855. Furthermore, a "verdict may be based in whole or in part on circumstantial evidence." *United States v. Anderson*, 78 F.3d 420, 422 (8th Cir. 1996); *see also United States v. Iron Hawk*, 612 F.3d 1031, 1036 (8th Cir. 2010) (finding that "the lack of direct evidence demonstrating [the defendant] assaulted [the victim] is not dispositive").

Applying this standard here, we cannot agree with the district court that no reasonable jury could find beyond a reasonable doubt that White intentionally assaulted A.W. We begin with the fact that White was alone with A.W. for the ten-minute period during which A.W.'s symptoms were first noticed. Maxwell, who spent almost all of that day with A.W., described his behavior before and during dinner as normal. Yet something changed during the ten minutes that White was alone with A.W. A.W. went from being his "usual self" to being in critical condition. By the time A.W. made it to the local emergency room, his condition was dire enough that his treating physician feared that he was going to die. This sudden and drastic change in A.W.'s condition during the ten minutes that White and A.W. were alone provides some circumstantial evidence of White's guilt.

The Government also presented medical evidence about A.W.'s injuries that would allow a reasonable jury to conclude that A.W. was intentionally injured immediately before his condition became apparent. In particular, Dr. Jackson described how A.W.'s CT scans showed acute blood on his brain that had been deposited there between three hours and three days earlier.[1] Dr. Jackson also provided a reasonable basis to infer that A.W. had suffered trauma to his brain, explaining that "in a young child, a spontaneous subdural hematoma is exceedingly rare, even in the literature, and so the most likely explanation is trauma."

Dr. Graff provided specifics about what may have caused A.W.'s condition. Dr. Graff testified that a non-accidental acceleration-deceleration or rotational injury was his "best estimate" of and the "most likely" cause of A.W.'s condition. Dr. Graff explained that this type of non-accidental trauma formerly was known as shaken baby syndrome. Dr. Fryer corroborated Dr. Graff's ultimate conclusion, telling the jury that, based upon A.W.'s symptoms, he believed that A.W. had been "shaken." According to Dr. Graff, when this type of trauma occurs, the resulting subdural hematoma looks like A.W.'s did. Dr. Graff also relied on the presence of bleeding on the back of A.W.'s eyes. This bleeding permeated multiple layers of A.W.'s eyes, a fact that Dr. Graff found to be telling because the potential causes for such an injury to a child generally are limited to high-velocity car accidents and acceleration-

---

[1]In filings under Federal Rule of Appellate Procedure 28(j), White and the Government dispute whether A.W.'s initial CT scans in Fargo were taken within three hours of when White was alone with A.W., thus placing A.W.'s injuries within the window of time established by Dr. Jackson. It appears that the jury was not presented with evidence about exactly when A.W.'s initial CT scans were taken other than that they occurred shortly after A.W. arrived in Fargo. For this reason, the Government moved to supplement the record with date- and time-stamped copies of these initial CT scans. The Government admits that the jury did not consider this evidence and offers no reason why it could not have been presented at trial. We thus deny the Government's motion to supplement the record. *See United States v. Sykes*, 356 F.3d 863, 865 (8th Cir. 2004).

deceleration injuries. A reasonable jury could find this testimony to be significant, especially because we can find no suggestion in the record that A.W. had been in a car accident of any kind. Dr. Graff also noted the presence of bruising inside of A.W.'s ears, which was "very concerning for some type of inflicted injury since no other medical causes or accidents have been provided."

Dr. Graff also provided testimony about the potential timing of A.W.'s injuries. In particular, Dr. Graff learned of three specific incidents involving A.W.—the "Johnny Jumper" incident, the toy-throwing incident, and the bath-tub incident—but ruled them out as a potential cause of A.W.'s condition. Dr. Graff did so for two reasons. First, he concluded that none of these incidents could explain the severity of A.W.'s injuries. And second, Dr. Graff learned that A.W.'s mood and sleeping and eating patterns had not changed before he was rushed to hospital. Dr. Graff told the jury that if A.W. had been injured sometime earlier in the day on August 30, he would expect that Maxwell and White would have noticed a change in A.W. Dr. Graff thus concluded that because A.W. "was reported to be down in that brief period of time when he'd been doing perfectly fine . . . I would expect that whatever caused that injury *had to occur* just prior to him going down." (emphasis added). A reasonable jury could find this conclusion to be fully consistent with an acceleration-deceleration injury because, as Dr. Graff testified, if such an injury is significant enough, the victim, particularly someone under the age of two, "stop[s] breathing and . . . lapse[s] into unconsciousness almost immediately."

In light of the sudden and drastic change in A.W.'s condition while he was alone with White, a reasonable jury could conclude from the testimony of Drs. Graff Fryer, and Jackson that A.W. suffered a non-accidental acceleration-deceleration injury during that time. As the district court correctly recognized, the medical testimony "certainly supports an inference that the event causing A.W.'s injuries occurred immediately before White observed the symptoms."

-11-

However, the district court discounted Dr. Graff's testimony about an acceleration-deceleration injury as too uncertain. The court analogized to one of our cases where an expert witness testified that a child's injury "would have been immediately symptomatic, which means that the injury *must* have occurred shortly before [the child] was found unresponsive and comatose." *United States v. Brown*, 360 F.3d 828, 831 (8th Cir. 2004) (emphasis added). Dr. Graff's testimony, the district court emphasized, "is not as certain or strong as the timing testimony in *Brown*." Merely comparing similar cases was not an error, but we have cautioned that "[p]rior cases are instructive but are seldom if ever controlling" because of the fact-intensiveness of sufficiency challenges. *United States v. Marquez*, 462 F.3d 826, 829 (8th Cir. 2006). For example, in *Brown*, the defendant actually stipulated that the victim's injuries were the result of shaken baby syndrome, something that did not occur here, and the victim in *Brown* suffered a different combination of injuries than did A.W. 360 F.3d at 830 n.2 & 831. We also note that, in other child-injury cases, we have found sufficient evidence based in part upon expert testimony that was quite similar to Dr. Graff's. *See United States v. Red Bird*, 450 F.3d 789, 791-93 (8th Cir. 2006); *Iron Hawk*, 612 F.3d at 1034-35, 1037; *see also Cavazos v. Smith*, 565 U.S. ---,132 S. Ct. 2, 6-7 (2011) (per curiam) (finding that a court was "plainly wrong" to grant a writ of habeas corpus based upon the sufficiency of the evidence where "[t]he State's experts, whom the jury was entitled to believe, opined that the physical evidence was consistent with, and best explained by, death from sudden tearing of the brainstem caused by shaking"). Consequently, although a comparison to a prior case can be helpful, the ultimate determination of whether sufficient evidence exists to support the verdict must be based upon the evidence presented to the jury.

White directs us to the expert testimony of Dr. Arden, who tied A.W.'s condition to a blunt-impact injury that could have occurred well before any symptoms were noticed. But the jury was entitled to discredit Dr. Arden's conclusion as inconsistent with the Government's evidence, especially Dr. Graff's testimony. *See Iron Hawk*, 612 F.3d at 1037. Furthermore, Dr. Arden actually gave the jury a reason

-12-

to disbelieve his testimony. He acknowledged that his conclusion about the delayed presentation of A.W.'s symptoms would change if A.W. had a direct brain injury. To quote Dr. Arden, "a direct brain injury can cause a child to become symptomatic very rapidly." Dr. Arden contrasted a direct brain injury with secondary damage to the brain from the pressure of a subdural hematoma. There was ample evidence for a reasonable jury to conclude that A.W. had a direct brain injury rather than a secondary brain injury. First, Dr. Fryer explained that A.W.'s extensor posturing shortly after the incident could indicate an injury at the deepest part of the brain. And second, and more importantly, Dr. Jackson, A.W.'s treating neurosurgeon, testified that "[i]n the situation here, there is an underlying brain injury." Dr. Jackson specifically contrasted A.W.'s underlying brain injury with pressure on the brain and gave two reasons why the pressure in A.W.'s head was not high. For these reasons, a reasonable jury could reject Dr. Arden's testimony and even find that it supports White's guilt.

Other circumstantial evidence also supports the jury's verdict. Dr. Fryer observed bruising that was almost symmetrical at the base of A.W.'s ears. Dr. Fryer opined that this bruising was fresh and was consistent with an injury that occurred hours or minutes earlier. By the time A.W. made it to Fargo, Dr. Gheen observed "obvious bruising" on A.W.'s head, and Dr. Graff noted bruising in A.W.'s ears. Although Dr. Graff could not opine about when this bruising occurred, he told the jury that it can suggest an inflicted injury. These observations by A.W.'s physicians take on more meaning when paired with Officer Ybarra's and Officer Lyons's testimony that they checked A.W. for injuries upon arriving at his home and did not see any bruises on his ears. This evidence would permit a reasonable jury to infer that the bruising in and around A.W.'s ears was recent because it became visible during the short period of time between when A.W. was examined at the house and when he was examined by his doctors.

-13-

White's explanations of what happened during the ten minutes he was alone with A.W. provide further circumstantial evidence of guilt. When Maxwell first learned of A.W.'s condition, White told her that he had found a cigarette filter in A.W.'s mouth. But White then told Officer Ybarra that A.W. could be choking on a cigarette butt *or* on food. And at trial, neither officer mentioned learning from White that he actually had removed a choking hazard from A.W.'s mouth. This variance in White's story about whether he removed something from A.W.'s mouth is magnified by the fact that none of the experts at trial posited choking as a potential cause of A.W.'s injuries and the fact that the officers did not see any choking hazards on the floor at the house. White's statements about what happened during the ten minutes that he was alone with A.W. contain another inconsistency. When the officers arrived at the house, White told Officer Lyons that A.W. was "eating hamburger, rice, and all of a sudden [he] started choking and he stopped breathing." Yet, when White spoke with Dr. Graff, White recalled things somewhat differently, stating that A.W.'s symptoms began after being moved from his high chair to his car seat and after being given a bottle. These variances in White's story could be explained by the stress that this episode put on White. But that was an argument for the jury to field, not a court reviewing a motion for judgment of acquittal. At this juncture, we must make every reasonable inference in favor of the verdict. *Id.* at 1036. Doing so, we conclude that the variances in White's story support an inference that he "was seeking to develop an explanation to cover up [his] own misconduct in causing injury to [A.W.]." *See Red Bird*, 450 F.3d at 793.

A reasonable jury also could find White's behavior after the incident to be further circumstantial evidence of guilt. After A.W. was airlifted to Fargo, White traveled to the hospital there, arriving after midnight on August 31. However, White did not immediately go to the hospital. This prompted an argument between White and Maxwell. Maxwell explained that "I wanted [White] to go over there right away to talk to the doctor, but he was tired." Even though the hotel where White stayed was adjacent to the hospital, he did not come to the hospital until around noon on

-14-

August 31. And White did not speak with Dr. Graff until around 9:00 p.m., even though Dr. Graff had "made [himself] available." A reasonable jury could make different inferences from White's failure to rush to his injured son's side and his delay in speaking with Dr. Graff, the child-abuse specialist. White could have been too tired to come to the hospital, as he told Maxwell. However, a reasonable jury also could interpret White's actions as a lack of concern for A.W. or unease about being questioned by a child-abuse specialist. At this juncture, we must assume the latter. *See id.*

Taken together, this evidence was sufficient for a reasonable jury to conclude beyond a reasonable doubt that White intentionally assaulted A.W. during the ten minutes that they were alone. In reaching a contrary conclusion, the district court erred by weighing the evidence. In particular, the court reasoned that White's defense that J.S. could have injured A.W. was "much stronger" than the defenses offered in our previous infant-injury cases and that Dr. Arden's testimony "[f]urther strengthen[ed]" White's defense. The district court ultimately reasoned that, in light of White's defense, it would require "too much speculation" to find White guilty. But the court's task was not to appraise the strength of White's defense against perceived weaknesses in the Government's case. *See Johnson*, 474 F.3d at 1048. That ultimate issue belonged to the jury. The court merely had to ask whether, "drawing all reasonable inferences in favor of the verdict, there is an interpretation of the evidence that would allow a reasonable minded jury to find the defendant[] guilty beyond a reasonable doubt." *Boesen*, 491 F.3d at 856 (alteration in original) (quoting *Oberhauser*, 284 F.3d at 829).

Even considering White's defense about J.S., a reasonable jury could find that White intentionally assaulted A.W. In addition to the evidence discussed above, the Government's evidence undermined any real possibility that J.S. had an opportunity to injure A.W. on August 30. Maxwell testified that A.W. was "always" with her; the only time she could not account for A.W. before dinner on August 30 was when she

-15-

showered. Maxwell, moreover, did not hear A.W. "cry out" at any time, and A.W. behaved normally until Maxwell left with J.S. and the other children. Viewing the evidence in the light most favorable to the verdict, a reasonable jury could reject White's defense in favor of a finding of guilt beyond a reasonable doubt. The district court reached the opposite conclusion, reasoning that "[t]he most the jury could have concluded from [Maxwell's] testimony is that during the periods of time which Maxwell actually observed A.W., J.S. did not inflict any injuries upon him." Not only did this conclusion fail to view the evidence in the light most favorable to the verdict, but the district court also overlooked the rule that the evidence need not rule out every reasonable hypothesis except guilt. *See id.* at 858 ("[O]ne possible innocent explanation for the government's evidence does not preclude a reasonable jury from rejecting the exculpatory hypothesis in favor of guilt beyond a reasonable doubt." (quoting *Johnson*, 474 F.3d at 1050)). To survive White's sufficiency challenge, the Government was not required to account for every moment of J.S.'s day. Rather, the Government merely had to present enough evidence, viewed most favorably to the verdict, for a reasonable jury to find beyond a reasonable doubt that White intentionally assaulted A.W. *See id.*

White concedes that the district court weighed the evidence but argues that it was proper for the court to do so. As support, White directs us to our statement that "[w]here the government's evidence is equally strong to infer innocence as to infer guilt, the verdict must be one of not guilty and the court has a duty to direct an acquittal." *United States v. Davis*, 103 F.3d 660, 667 (8th Cir. 1996) (quoting *United States v. Kelton*, 446 F.2d 669, 671 (8th Cir. 1971)). The Government responds by citing our statement that "[i]f the evidence rationally supports two conflicting hypotheses, the reviewing court will not disturb the conviction." *United States v. Baker*, 98 F.3d 330, 338 (8th Cir. 1996) (quoting *United States v. Burks*, 934 F.2d 148, 151 (8th Cir. 1991)). Several panels of this court have grappled with the arguable tension between *Davis* and *Baker*, going so far as to label it a "legal swamp." *United*

-16-

*States v. Williams*, 647 F.3d 855, 861 & n.6 (8th Cir. 2011). We have harmonized these two lines of cases by concluding that "*Davis* refers only to the government's evidence, while *Baker* refers to all of the evidence, including that presented by the defense." *Boesen*, 491 F.3d at 857 (collecting cases); *Williams*, 647 F.3d at 861. Consequently, even *Davis* does not permit a freewheeling weighing of the Government's case against White's defense. Rather, "[k]ey to *Davis* is its focus on 'the government's evidence' being equivocal." *Williams*, 647 F.3d at 861.

We have no hesitation concluding that, under *Davis*, the balance of the Government's case against White favored guilt. The Government's case did contain evidence about J.S., including testimony about his previous behavior and testimony that his sister had teased him about hurting his younger brother. But, as exhaustively discussed above, the Government's case also contained evidence that a reasonable jury could find to be powerful evidence of White's guilt as well as evidence that J.S. did not injure A.W. on August 30. For these reasons, it cannot be said that the Government's evidence of guilt and innocence was in equipoise. Indeed, the district court agreed with this conclusion at the close of the Government's case, finding that "at least on the basis of the Government's case . . . there is evidence from which a reasonable jury could conclude that the Defendant is guilty." Consequently, even if the narrow rule from *Davis* is considered here, it is of no help to White.

In sum, a reasonable jury could conclude that White intentionally assaulted A.W. The district court's contrary conclusion rested on its weighing of the evidence. But a court reviewing a motion for judgment of acquittal is not a thirteenth juror with a veto. *See United States v. Porter*, 409 F.3d 910, 915 (8th Cir. 2005). For the reasons discussed above, we conclude that it was an error to grant White's motion for judgment of acquittal.

## III. Conclusion

We reverse the district court's judgment and remand with instructions to reinstate the jury's verdict.

KELLY, Circuit Judge, dissenting.

Upon review of a judgment of acquittal, a jury's verdict may be reversed only if "no reasonable jury could have found the defendant guilty beyond a reasonable doubt." United States v. Serrano-Lopez, 366 F.3d 628, 634 (8th Cir. 2004) (quoting United States v. Frank, 354 F.3d 910, 916 (8th Cir. 2004)). As the court states, in conducting this review we view all evidence in the light most favorable to the government and accept all reasonable inferences in support of the jury's verdict. United States v. Boesen, 491 F.3d 852, 855–56 (8th Cir. 2007). Though this is a strict standard that requires a great deal of deference to the jury's fact-finding, it still requires that there be "an interpretation of the evidence that would allow a reasonable minded jury to find the defendant[] guilty *beyond a reasonable doubt*." Id. at 856 (alteration in original) (emphasis added) (quoting United States v. Oberhauser, 284 F.3d 827, 829 (8th Cir. 2002)). It is therefore not enough to find that a reasonable jury could believe a particular fact to be true based on the evidence presented. Rather, the evidence must be sufficient to allow the jury to find all elements of the offense beyond a reasonable doubt.

This too is a strict standard. As the jury in this case was instructed, beyond a reasonable doubt requires "proof of such convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his or her own affairs." Tr. at 523; *see* EIGHTH CIR. MODEL JURY INSTRUCTIONS 12.02 (rev. 2014). Reasonable doubt is "a doubt based upon reason and common sense," and is "the kind of doubt that would make a reasonable person hesitate to act" in the most important

of their own affairs.  <u>United States v. Knight</u>, 547 F.2d 75, 77 (8th Cir. 1976).  This high standard of proof corresponds to the extraordinarily high stakes of a criminal prosecution, and is "bottomed on a fundamental value judgment of our society that it is far worse to convict an innocent man than to let a guilty man go free."  <u>In re Winship</u>, 397 U.S. 358, 372 (1970) (Harlan, J., concurring).

Despite proper instruction on this critical standard, a "jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 317 (1979).  I believe that to be the case here.  In order to conclude that White was guilty of assaulting A.W., the jury would have had to find that White suddenly, inexplicably, and intentionally shook A.W. during the short 10-minute period that they were alone together on the night of August 30, 2013.  The jury would have had to find that both the type of injury A.W. suffered and the timing of that injury meant that the injury must have been inflicted by White in that 10-minute period.  The jury would have to arrive at this conclusion despite the fact that circumstantial evidence identified other possible causes of the injury to A.W.  The jury would also have had to conclude that White assaulted A.W. despite the uncontroverted evidence that White had no history of violent behavior toward his two children and three step-children.

As the district court noted, a jury's verdict should be overturned if there is a lack of proof beyond a reasonable doubt of even one element of the charged offense.  <u>United States v. Frausto</u>, 616 F.3d 767, 772 (8th Cir. 2010).  Here, the only evidence that White assaulted A.W. is circumstantial, and the jury's conclusion that White *intentionally* assaulted A.W. requires an inference without a sufficient evidentiary basis.  A reasonable jury could believe that White may have assaulted his son, probably assaulted his son, or even very likely assaulted his son.  But to find White guilty, the jury must find *beyond a reasonable doubt* that White intentionally committed the assault.  Even construing all the medical and other circumstantial

evidence in favor of the jury's verdict, I believe that no reasonable jury could conclude beyond a reasonable doubt that White intentionally assaulted A.W.

Both this court and the district court have carefully and conscientiously reviewed the evidence in this very sad case. There is no doubt that this is a close case, and that the jury was required to make a series of difficult decisions with regard to the credibility and weight of the evidence. Viewing all the evidence in the light most favorable to the jury's verdict and drawing all favorable inferences in favor of the verdict, however, I agree with the district court: I cannot conclude that a reasonable jury could have found White guilty beyond a reasonable doubt. Accordingly, I respectfully dissent.

———————————————