# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3081

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the District |
| | * | of South Dakota. |
| Frank Iron Hawk, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: May 14, 2010
Filed: July 22, 2010

_____

Before BYE, MELLOY, and SHEPHERD, Circuit Judges.

_____

BYE, Circuit Judge.

Following a jury trial, Frank Iron Hawk was sentenced by the district court[1] to 120 months' imprisonment for assault resulting in serious bodily injury to a child in violation of 18 U.S.C. §§ 113(a)(6) and 3559(f)(3), and 57 months' imprisonment for child abuse in violation of 18 U.S.C. § 1153 and South Dakota Codified Law (S.D.C.L.) § 26-10-1. On appeal, Iron Hawk contends the evidence was insufficient to sustain his conviction. In addition, he argues the district court erred by admitting

_____

[1]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

testimony of the victim's permanent injury and in denying his offer of proof of a chronic injury. We affirm.

I

The following facts were adduced at trial. Frank Iron Hawk is the father of R.L.E., born December 17, 2003. In June 2006, R.L.E., then two and one-half years old, was removed from the custody of her mother, Samantha Lone Eagle, by Child Protective Services of the South Dakota Department of Social Services. She was placed in a kinship custody placement with Iron Hawk's mother, Rose Iron Hawk, and Frank helped take care of his daughter at his mother's home.

According to Iron Hawk's testimony, on the morning of September 25, 2006, Rose went with Frank's brother and sister-in-law, Torin and Chambliss Iron Hawk, to enroll one of Torin's children in school, leaving Frank and R.L.E. alone at the house for about an hour. Iron Hawk stated he fed R.L.E. cereal in the kitchen for breakfast while he watched television. Around this time, Iron Hawk spoke with Samantha to arrange visitation with R.L.E. During their conversation, Glenn Gunville from Social Services called Iron Hawk to discuss Samantha's visitation. After Iron Hawk finished his conversation with Gunville, he again spoke with Samantha. During this time, Iron Hawk stated he was in the bedroom located at the end of the hallway, while R.L.E. was playing in the living room.

After getting off the phone, Iron Hawk went back to the living room and saw R.L.E. getting up from the floor near a metal floor vent. She had vomited on herself and it appeared she was choking. Iron Hawk picked R.L.E. up and brought her to the bathroom to clean up the mess. He then took her across the hall into Torin's room and placed her on the bed while he went to the kitchen to get a mop to clean the floor. Iron Hawk then brought R.L.E. back into the living room and put her on the couch to watch some television. After cleaning up some more in the other room, he returned

to see R.L.E. vomiting and experiencing spells of dizziness. At this point, Iron Hawk began to panic and brought R.L.E. to the bathroom, asking her questions. When he brought her back out to the living room, he heard Rose, Torin, and Chambliss returning in their vehicle. Iron Hawk ran outside and told his mother R.L.E. was sick. Rose called an ambulance and indicated to emergency services that R.L.E. may be having a seizure. She also told emergency personnel they would meet the ambulance on the highway.

During the drive to the ambulance, R.L.E. appeared to be sleeping, but she was actively moving and she continued to vomit in the car. Upon being transferred to the paramedics, R.L.E. was observed to have bruises on her forehead, left cheek, and right lip, and a bruise or a bump on the back of the right side of her head. One of her eyes was dilated and the other eye was constricted, and the paramedics were concerned she had head trauma due to these signals and her "posturing," or intermittent pulling of her arms, flexing her muscles, and pointing her toes. She also had an abnormal blood pressure and erratic pulse and respiration. The paramedics brought R.L.E. to the emergency room in Eagle Butte, South Dakota at 10:50 a.m.

At the hospital, Iron Hawk spoke briefly with Dr. Alvin Beezley about the incident. Iron Hawk also called Samantha to inform her that R.L.E. was in the hospital, and he spoke with Gunville and Officer Don Farlee, who asked him to fill out a report. A few days later, Iron Hawk spoke with Officer Larry LeBeau concerning the incident. While the government asserts Iron Hawk's story varied between each of the individuals he spoke with, in general, he denied having knowledge about what caused R.L.E.'s condition. Iron Hawk speculated R.L.E. may have slipped in her vomit, fallen, and hit her head–possibly on the wood trim on the couch or on the metal grate in the living room floor. He also stated the bruises on R.L.E.'s cheeks may have come from a fall she sustained a few days earlier at the creek when she hit her face on the ground. In addition, Iron Hawk said sometimes

R.L.E. would throw a fit and toss herself back and hit her head on the floor or the wall.

Shortly after her arrival in Eagle Butte, R.L.E. was transferred by air to the pediatric intensive care unit in Sioux Falls. Dr. Susan Duffek, a pediatric radiologist, read R.L.E.'s CT scan and noted she had subdural hemorrhaging along the right side of her head, meaning there was blood between her skull and brain. The hemorrhage was so significant it pushed her brain out toward the left in what is described as a "midline shift" or "mass effect." Dr. Duffek believed the large subdural hematoma was the result of a significant head injury and the type of mechanism to cause such an injury was either child abuse or a motor vehicle accident. She noted a simple fall could not have caused the head trauma and R.L.E. could not have caused the injury to her head, either intentionally or accidentally.

The next day, Dr. Edward Mailloux, a general pediatrician and child advocate, saw R.L.E. while she was still in critical condition. He evaluated her as having sustained a head trauma resulting in a subdural hematoma over the right side of her brain. Dr. Mailloux later testified a subdural hemorrhage occurs when very specific veins break between the brain and the skull, and in this case those veins were on the right side of her head. Dr. Mailloux consulted ophthalmologist Dr. Geoffrey Tufty, who found R.L.E. had retinal hemorrhage or bleeding of the retinas in both of her eyes. Dr. Mailloux also concluded R.L.E. was the victim of non-accidental trauma, ruling out the possibility her injury could have been caused by a simple accidental fall. He also ruled out choking as a means of causing the acute subdural hematoma. Iron Hawk had objected to Dr. Mailloux's testimony because Dr. Mailloux had not seen R.L.E. for some time, and yet offered his opinion that she would have permanent brain injury. Iron Hawk also notes Dr. Mailloux testified R.L.E. did not have any other injuries consistent with child abuse, such as fractures of her ribs or other bones, or other internal organ injuries.

On October 5, 2006, R.L.E. was transferred to the children's hospital in Sioux Falls, South Dakota. She was placed in therapeutic foster care on November 20, 2006. After an attempted placement with her mother Samantha, R.L.E. was placed with her siblings in a foster home due to Samantha's alcohol-related neglect. She continued in foster care at the time of trial, receiving weekly physical, speech, and language therapy.

At trial, the parties primarily disputed whether R.L.E.'s injuries were both chronic and acute or acute and subacute. If R.L.E. had a prior chronic subdural hematoma, as Iron Hawk believed, a simple fall might have re-bled and caused her subsequent significant head injury. Without an older injury, however, a simple fall could not have been the cause of the head trauma. To establish his theory, Iron Hawk relied on the testimony of Dr. Mark Fox, a consulting neurosurgeon and assistant professor of medicine at the University of South Dakota. Dr. Fox reviewed the CAT scan images and concluded R.L.E. had suffered an acute subdural hematoma within less than a couple of days. He also noted an accumulation of older blood, a subacute hematoma, a few days to perhaps several weeks old. Dr. Fox concluded there were two different episodes of bleeding, and the older subdural hematoma could start to re-bleed as the result of a second injury involving lesser force or degree of impact.

Iron Hawk was charged in a superseding indictment with one count of assault resulting in serious bodily injury to a child in violation of 18 U.S.C. § 113(a)(6), and one count of child abuse in violation of 18 U.S.C. § 1153 and S.D.C.L. § 26-10-1. The jury found him guilty on both counts. Iron Hawk's Presentence Investigation Report ("PSR") recommended he be given a two-level enhancement for obstruction of justice because he lied at trial, resulting in a Guidelines sentence of 57 to 71 months. At sentencing, the district court adopted this recommendation because it concluded Iron Hawk had denied assaulting R.L.E. and offered no plausible explanation for her injury. Despite the Guidelines range, the district court ultimately imposed the mandatory minimum sentence of 120 months required by 18 U.S.C.

§ 3559(f)(3) for assault, as well as a concurrent sentence of 57 months on the child abuse count.  Iron Hawk timely appealed.

II

On appeal, Iron Hawk argues (A) there was insufficient evidence to sustain his convictions; (B) the district court erred in admitting testimony of the victim's permanent injury; and (C) the district court erred in denying his offer of proof of a chronic injury that was necessary to support his theory of defense.  We address each argument in turn, as follows:

A.  The Sufficiency of the Evidence

Iron Hawk first contends the evidence was insufficient to support his convictions.  "We review de novo the sufficiency of the evidence, viewing the evidence in the light most favorable to the jury verdict and giving the verdict the benefit of all reasonable inferences."  United States v. Molina-Perez, 595 F.3d 854, 859 (8th Cir. 2010).  This strict standard permits reversal "only if we conclude that no reasonable jury could have found the accused guilty beyond a reasonable doubt."  Id. at 860.

Iron Hawk argues the overwhelming evidence in this case went to proving R.L.E. suffered a serious bodily injury, which was never contested, but nothing showed he caused R.L.E.'s injuries.  He asserts he gave one consistent version of what he believed happened–that R.L.E. vomited after eating breakfast, slipped on her vomit, and hit her head on the floor or perhaps a metal heating grate in the floor.  He claims he identified other possibilities in response to inquiries from Gunville, LeBeau, and others who asked him to suggest what might have happened, such as her falling down by the creek a few days earlier.  Because of the lack of evidence, Iron Hawk

argues, the jury could only speculate that because he and R.L.E. were the only two people in the house, he must have engaged in criminal conduct that caused her injury.

To establish an assault conviction under count I, the government was obligated to prove "(1) an intentional assault that (2) results in serious bodily injury, committed (3) by an Indian and (4) within Indian Country." United States v. Littlewind, 595 F.3d 876, 882 (8th Cir. 2010) (citing United States v. Stymiest, 581 F.3d 759, 766 (8th Cir. 2009)). Similarly, to establish a conviction for felony child abuse under count II, the government had to prove Iron Hawk, without just cause, abused, exposed, tortured, tormented, or cruelly punished R.L.E., she was under seven years of age, Iron Hawk was an Indian, and the offense took place in Indian Country. S.D.C.L. § 26-10-1; 18 U.S.C. § 1153.

The parties agree Iron Hawk's convictions were based upon circumstantial evidence, primarily in the form of testimony from medical professionals establishing the nature and significance of R.L.E.'s injuries. As an initial matter, "a conviction may be based on circumstantial as well as direct evidence." United States v. Van Nguyen, 602 F.3d 886, 898 (8th Cir. 2010) (quoting United States v. Erdman, 953 F.2d 387, 389 (8th Cir. 1992)). Thus, the lack of direct evidence demonstrating Iron Hawk assaulted R.L.E. is not dispositive.

In analyzing the sufficiency of the medical evidence, we find instructive a very similar case decided by this court, United States v. Red Bird, 450 F.3d 789 (8th Cir. 2006). In Red Bird, the defendant was charged with assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 113(a)(6) and 1153 after her infant son died. 450 F.3d at 790. The pathologist who conducted the autopsy concluded the infant "had suffered traumatic injury to the brain, described as subdural hematomas and subarachnoid hemorrhaging." Id. at 791. The doctor also observed retinal hemorrhaging in both eyes, which he believed to be consistent with head trauma. Id. at 792. At trial, the doctor testified his findings were consistent with shaken baby

syndrome.  Id.  The defendant relied on testimony from a doctor who believed the infant could not have suffered such serious traumatic brain injury from the shaking alone, and there must have been evidence of impact.  Id.  The doctor concluded the infant had suffered no acute, or fresh, trauma.  Id.

On appeal, this court held the evidence was sufficient to support the jury's verdict because the expert testimony of the medical professionals "provided ample grounds to believe that [the child] suffered serious injury to the brain while in Red Bird's sole custody, and that it was caused by shaken baby/shaken impact syndrome." Id. at 793.  The court concluded the defendant's alternating statements about the circumstances of the incident also supported an inference that she was seeking to cover up her own misconduct.  Id.  Further, the court determined "[t]he jury was entitled to discredit [the defendant's medical expert] testimony as inconsistent with that of the other experts, and in light of impeachment evidence elicited by the government."  Id.

Similar to Red Bird, the majority of the evidence in this case tying Iron Hawk to the assault and child abuse rests upon the testimony of medical professionals.  The government presented testimony from four medical doctors establishing a mere fall could not have caused R.L.E.'s significant head injuries.  Iron Hawk contradicted these findings by presenting testimony from Dr. Fox as to the likelihood of R.L.E.'s injuries being a mere recurrence of an earlier injury.  On an appeal challenging the sufficiency of the evidence, we "must not weigh the evidence or assess the credibility of witnesses."  Littlewind, 595 F.3d at 882 (citation omitted).  These determinations are within the province of the jury, which was entitled to credit the testimony presented by the government and discredit Dr. Fox's testimony.  Id.  ("The jury was entitled to credit [the government's medical expert] testimony and to discredit arguably contradictory testimony.").

The testimony from the medical professionals presented by the government provided a sufficient basis for the jury to conclude R.L.E.'s serious injuries were caused by Iron Hawk. Four different medical doctors–Duffek, Mailloux, Kaplan, and Patterson–testified that R.L.E.'s serious head injuries could not have been caused by a simple fall, that the injuries were acute (very recent), and the injuries could have only been caused by non-accidental trauma, a high speed motor vehicle accident, or a very high fall (over ten feet). Based on this evidence, it cannot be said no reasonable jury could conclude Iron Hawk was guilty. The jury's remaining inference to connect Iron Hawk to R.L.E.'s injury was not unreasonable in light of his sole custody during the one-hour period of time, as established by Red Bird. While the parties dispute whether Iron Hawk provided conflicting accounts after the incident, the inference which could be drawn from these conflicting accounts is not necessary to support Iron Hawk's convictions in light of the medical evidence. We thus conclude there was sufficient evidence to prove beyond a reasonable doubt Iron Hawk's offense.

B. The District Court's Evidentiary Rulings

Iron Hawk next challenges two evidentiary rulings made by the district court during trial. The district court's evidentiary rulings are reviewed for an abuse of discretion. United States v. Smith, 591 F.3d 974, 979 (8th Cir. 2010). "We will not reverse a judgment on the basis of erroneous evidentiary rulings absent a showing that those rulings had a substantial influence on the jury's verdict." Id. (citing United States v. Haskell, 468 F.3d 1064, 1074 (8th Cir. 2006)).

First, the government asked its witness, Dr. Mailloux, whether in his opinion R.L.E.'s injury would be permanent. Iron Hawk objected for lack of foundation, but after some rephrasing by the government, the district court allowed Dr. Mailloux to answer, "the child–just from my observations of the . . . CAT scans and so forth, the child is going to have permanent brain injury. There is no doubt about that." Iron Hawk moved to strike the testimony for lack of foundation, arguing Dr. Mailloux had

not seen R.L.E. for almost two and one-half years according to his earlier testimony. The district court indicated "that's not required," and stated it was "up to the jury what weight to give . . . those types of opinions." The court reiterated the fact Dr. Mailloux had not seen R.L.E. for some time "goes to the weight of the evidence, and that's up to the jury, what weight to give any evidence." It instructed the jury that it could "give it some weight, no weight, or a lot of weight."

Iron Hawk maintains the district court's ruling was incorrect because Dr. Mailloux did not know R.L.E.'s condition at the time of trial and he had not seen her for two and one-half years, thus resulting in a lack of personal knowledge. He also asserts there was no foundation to admit Dr. Mailloux's testimony as an expert opinion. Iron Hawk argues he was unfairly prejudiced as a result of the district court's ruling, and the matter should be remanded for a new trial.

Under Rule 702, a district court may "allow the testimony of a witness whose knowledge, skill, training, experience or education will assist a trier of fact in understanding an area involving specialized subject matter." United States v. Solorio-Tafolla, 324 F.3d 964, 966 (8th Cir. 2003) (citing United States v. Molina, 172 F.3d 1048, 1056 (8th Cir. 1999)). In any event, "[a] foundation should be laid establishing the basis of a witness's knowledge, opinion, or expertise." United States v. Rosado-Perez, 605 F.3d 48, 55 (1st Cir. 2010) (citing Fed. R. Evid. 602, 701, 702); United States v. Greatwalker, 356 F.3d 908, 912 (8th Cir. 2004) ("Before any expert evidence may be admitted . . . the party seeking its admission must lay a proper foundation for the trial court to decide its reliability.").

After careful review of the record, we conclude the government established a proper foundation before soliciting Dr. Mailloux's expert opinion. Dr. Mailloux testified extensively as to his employment as a pediatrician and medical director in Sioux Falls, his medical training and certifications, and his specialized pediatric training in child abuse. He indicated he evaluated between three and four hundred

children per year, including Iron Hawk's daughter in the instant matter. While Dr. Mailloux had not seen R.L.E. for quite some time, he reviewed R.L.E.'s medical records prior to giving his opinion, which helped establish the basis for his opinion about suffering permanent loss of brain tissue. Under these circumstances, the district court did not abuse its discretion in allowing Dr. Mailloux to provide his opinion of R.L.E.'s permanent brain injury. See United States v. Two Elk, 536 F.3d 890, 905 (8th Cir. 2008) ("[B]y basing his testimony on the myriad other pediatric examinations he has performed, Dr. Mailloux did exactly what an expert witness should do: answer questions about [the child victim's] injuries in light of his specialized medical expertise and his experience."); United States v. Withorn, 204 F.3d 790, 797 (8th Cir. 2000) (holding the expert's extensive testimony as to her background adequately qualified her to provide observations regarding the victim's injuries that were helpful to the jury). The testimony was likely to assist the trier of fact and the court correctly instructed the jury it could determine the quantum of weight to assess the testimony. Id.; Larson v. Kempker, 414 F.3d 936, 941 (8th Cir. 2005) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.").

Even if Dr. Mailloux's testimony was not admissible, any error was harmless. United States v. Oliver, 908 F.2d 260, 264 (8th Cir. 1990) (holding any error in admitting testimony was harmless because there was substantial evidence besides the testimony to support the findings). In order to constitute reversible error, the erroneous testimony had to substantially influence the jury's verdict. Smith, 591 F.3d at 983. In light of the extensive medical evidence procured by the government demonstrating R.L.E.'s serious bodily injury–a fact which Iron Hawk concedes–it cannot be said that Dr. Mailloux's isolated statement about her permanent brain injury substantially influenced the jury's verdict. This is particularly true when taken in conjunction with the other similar expert testimony on the issue, such as Dr. Kaplan's testimony that R.L.E. "has actually lost brain tissue." See Trial Tr. at 440-41 ("R.L.E.

-11-

has clearly lost brain tissue . . . I can't quantify what that means . . . with all therapies we can do for children, I don't want to write her off as not having a normal or possibly normal life; but she has lost brain capacity and brain tissue."). Moreover, Iron Hawk in his cross-examination of the government's experts placed the true condition of R.L.E.'s injury and recovery before the jury. Under such circumstances, any error on the district court's part did not substantially influence the verdict. As a result, we conclude the district court did not abuse its discretion in allowing Dr. Mailloux's testimony.

Finally, Iron Hawk challenges the district court's denial of his offer of proof. In relation to Dr. Fox's opinion that R.L.E.'s injury resulted from a re-bleed of a prior chronic injury, Iron Hawk sought to introduce testimony regarding the condition of Samantha's apartment during the time R.L.E. was in her custody. Iron Hawk alleges Samantha placed R.L.E. in a dangerous environment because her apartment complex contained steep stairs and Samantha was negligent in her care. To demonstrate these conditions, Iron Hawk sought to introduce testimony from Umpo Vance, a nearby tenant, who had blocked off identical stairs in her complex to keep children from falling down.

The district court denied Iron Hawk's offer of proof because it concluded the evidence that R.L.E. might have fallen down these stairs during the time she was with Samantha was too speculative. Iron Hawk contends he needed Vance's testimony to support Dr. Fox's opinion as to there being an earlier chronic injury. He further argues the government's remarks in closing argument that Dr. Fox's theory does not hold water because no chronic injury was shown demonstrates the unfair prejudice of the court's ruling because it undercut the credibility of Dr. Fox and denied Iron Hawk the full opportunity to present his defense.

Rule 403 of the Federal Rules of Evidence provides, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the

-12-

danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Unfair prejudice speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." United States v. Nadeau, 598 F.3d 966, 969 (8th Cir. 2010) (citation and internal quotation marks omitted). On appeal, the district court is given significant deference in its Rule 403 determination, which is particularly appropriate because the Rule 403 analysis requires "on-the spot balancing" of probative value and prejudicial effect. 2-403 Weinstein's Federal Evidence § 403.02.

We conclude the district court did not abuse its discretion by excluding Vance's proffered testimony as too speculative. Iron Hawk was entitled to prove his theory of defense, including introducing evidence supporting Dr. Fox's chronic injury theory. However, he was not permitted to provide speculative testimony which could only fit his theory under unreasonable inferences. Vance never witnessed R.L.E. falling down the steps, nor was a related injury ever reported to social services, the Indian Health Service medical facility, or any other person or entity. While Dr. Fox theorized R.L.E. had suffered some type of earlier injury, there was no reasonable basis to suggest R.L.E. ever fell down the stairs at Samantha's apartment. As a result, even if the evidence was admissible under Rule 401, the district court acted within its discretion in excluding the testimony under Rule 403 because it would have encouraged the jury to make its determination from improper reasoning. United States v. Looking Cloud, 419 F.3d 781, 785 (8th Cir. 2005); United States v. King, 572 F.2d 1274, 1275 n. 4 (8th Cir. 1978) ("[E]vidence which is vague and speculative is not competent proof and should not be admitted into evidence.") (citing United States v. Maestas, 554 F.2d 834, 837 n.2 (8th Cir. 1977)).

For the foregoing reasons, we affirm the judgment of the district court.

_____