# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-3626
_____

United States of America

*Plaintiff - Appellee*

v.

Tyson Keepseagle

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Northern

_____

Submitted: October 20, 2021
Filed: April 12, 2022

_____

Before SMITH, Chief Judge, WOLLMAN and BENTON, Circuit Judges.

_____

SMITH, Chief Judge.

Tyson Keepseagle appeals his conviction on three counts of a four-count indictment for child abuse, in violation of South Dakota Codified Law § 26-10-1, pursuant to 18 U.S.C. § 1153. Each count concerned a different child—AR.Q. (Count I), AY.Q. (Count II), S.Q. (Count III), and R.Q.J. (Count IV). At trial, the jury found Keepseagle guilty on Counts I, III, and IV but acquitted him on Count II. Keepseagle

raises three issues on appeal: (1) the district court plainly erred by not giving a specific unanimity instruction for Count I because the government elicited three separate acts of abuse against AR.Q.; (2) the district court erred in denying his motion for judgment of acquittal on all counts because the government failed to prove beyond a reasonable doubt that he committed any acts of abuse; and (3) the district court abused its discretion in denying his motion for continuance. Because we conclude that the district court plainly erred in not giving a special unanimity instruction for Count I, we vacate Keepseagle's conviction on that count and remand for a new trial. We affirm the district court's judgment in all other respects.

## I. *Background*
### A. *Underlying Facts*

Ronald Quilt, Sr. and Margaret Archambault are the parents of R.Q.J., D.Q., S.Q., B.Q., AR.Q., and AY.Q. At all relevant times, the children resided with their mother Archambault and stepfather Keepseagle in Bullhead, South Dakota.

On August 10, 2018, Quilt and his wife, Charlotte Uses Arrow Quilt (Charlotte), attended a powwow in Bullhead. B.Q., S.Q., AR.Q., and AY.Q. happened to be at the powwow, too. At the powwow, S.Q., about age 11 at the time, asked Charlotte to braid her hair. While brushing S.Q.'s hair, Charlotte noticed bruising on S.Q.'s right ear and called for Quilt. Quilt then saw the bruising on both of S.Q.'s ears.

Concerned that the children were at the powwow unsupervised and in the extreme heat, Quilt decided to walk the children to Archambault and Keepseagle's home. He walked them "halfway" and "didn't go all the way into the yard." R. Doc. 118-1, at 40. He instructed the children to go inside the house. He observed them walk to the house, walk up the steps, and open the door. Quilt then "turned around" and began to walk away. *Id.* Shortly, however, he "hear[d] a child crying, and [he] heard stomping." *Id.* Quilt "looked back" and saw Keepseagle "assault[ing] [AR.Q.]

with his fist. [Keepseagle] was punching [AR.Q.'s] face." *Id.* at 41. AR.Q. was crying. Quilt then "ran towards the house." *Id.* As he approached, he yelled at Keepseagle. Keepseagle then "turned around" and "threw [AR.Q.] off the . . . porch, and [AR.Q.] kind of rolled." *Id.* at 42. AR.Q. was between three and four years old at the time. According to Quilt, he also witnessed Keepseagle pull AY.Q. "out of the screen door" and "throw[] [her] off the . . . porch." *Id.* at 45. She was approximately six years old at the time.

Quilt approached the house. Keepseagle entered the residence and closed the door. Quilt knocked on the door, but no one answered. Quilt then took the children back to the powwow. He noticed "a tad bit of blood" around AR.Q.'s nose and "around the mouth." *Id.* at 48. According to Quilt, he also noticed "[d]ried blood and a little bit of swelling around [AY.Q.'s] nose." *Id.*

That evening, Quilt photographed the children's injuries and attempted to report the incidents to the police but was unsuccessful. The next morning, Quilt went to the tribal prosecutor's office and reported the incidents. After Quilt spoke with the prosecutor, he also spoke to Officer Dustin Dobbs, Bureau of Indian Affairs (BIA) Law Enforcement, Standing Rock. Quilt told Officer Dobbs that he had witnessed Keepseagle assault AR.Q. He also informed Officer Dobbs of S.Q.'s assault allegation. Officer Dobbs obtained a warrant for Keepseagle's arrest.

Officer Dobbs went to Keepseagle's residence and arrested him. Child protective services, also present at the time of arrest, removed the children from the home. Officer Dobbs noticed that S.Q. was crying and had "some visible markings on her ears." *Id.* at 12. He described the markings as "red[] with some scabs on the top of them." *Id.* at 13. S.Q. told Officer Dobbs that Keepseagle had "picked her up by her ears." *Id.* at 15.

After the children were removed from Archambault's and Keepseagle's care, they were placed in Quilt's care. During a subsequent forensic interview, R.Q.J. said that Keepseagle had "hurt" him during the "two-month timeframe before the pow wow." *Id.* at 108. Specifically, Keepseagle would pull R.Q.J.'s hair when he was angry with R.Q.J. and sometimes throw him down, pick R.Q.J. back up, and then throw him down again. According to R.Q.J., Keepseagle did "[t]he same thing" to S.Q. *Id.* at 110. R.Q.J. was approximately 14 at the time.

## B. *Procedural History*

On May 15, 2019, a federal grand jury indicted Keepseagle on four counts of child abuse, in violation of South Dakota Codified Law § 26-10-1, pursuant to 18 U.S.C. § 1153. Each count pertained to a different child. Counts I and II concerned Keepseagle's alleged abuse "[o]n or about between the 1st day of June, 2018, and the 12th day of August, 2018," of AR.Q. and AY.Q., who were both under the age of 7. R. Doc. 1-2, at 1. Counts III and IV concerned Keepseagle's alleged abuse of S.Q. and R.Q.J. during the same timeframe. These counts concerned the abuse of "a child who had not attained the age of 18." *Id.* at 2.[1]

### 1. *Pre-Trial Developments*

The court set Keepseagle's trial for July 8, 2020. About a month before trial, a defense investigator talked with one of the abuse victims and heard the child assert that Quilt used "physical abuse and coercion" to influence the children to testify falsely against Keepseagle. R. Doc. 78, at 1. A week prior to trial, the same abuse victim told agents that Quilt "had physically abused him and his sister." *Id.* at 2. He also reported that Quilt had purchased alcohol for his siblings and directed another sibling to punch his sister when she "stated she missed her mom." *Id.* The sister,

---

[1]Under South Dakota law, a "person is guilty of a Class 3 felony" "[i]f the victim is less than seven years of age." S.D. Codified Laws § 26-10-1. Otherwise, it is "a Class 4 felony." *Id.*

however, denied any physical abuse by Quilt. Nonetheless, authorities removed the children from Quilt's custody. Two days before trial, the government disclosed reports to the defense detailing the abuse victim's allegations against Quilt. The day before trial, defense counsel received a report of an interview done that day "in which the sister described physical abuse by . . . Quilt." *Id.* She admitted to drinking alcohol with Quilt and "confirmed being made fun of because she missed her mom and that one of her other sibling's punched her in the stomach." *Id.*

On the morning of trial, Keepseagle moved for a continuance based on the "new information" received from the government the two days prior. *Id.* Before the court, defense counsel argued that the new information went "to the heart of [Keepseagle's] defense, which is that [Quilt] . . . falsely reported or grossly exaggerated the initial incident with the two youngest children; that when the children were in [Quilt's] care, he did what he could to get them to say what they needed to say—or what he wanted them to say in the interview." R. Doc. 118, at 9. The district court denied the continuance motion and trial commenced.

## 2. *Trial*

At trial, the minor children, S.Q., D.Q., R.Q.J., and B.Q. testified about Keepseagle's alleged abuse. Specifically, S.Q. testified about an incident that occurred around the time of the powwow when she was 11 years old in which Keepseagle got angry with her, grabbed her by the ears, and lifted her into the air. During cross-examination, defense counsel asked S.Q. whether Quilt "ever [told] [her] what to say about [Keepseagle]." *Id.* at 108. S.Q. responded, "No." *Id.* Defense counsel inquired whether Quilt ever "gave [her] anything, like money or clothes . . . , to get [her] to testify against [Keepseagle]." *Id.* S.Q. answered that Quilt "never gave [her] nothing." *Id.* S.Q. also responded in the negative when defense counsel asked whether Quilt "[]ever gave [her] any alcohol in hopes of getting [her] to testify against [Keepseagle]." *Id.* S.Q. denied telling law enforcement that she drank around Quilt.

On direct examination, the government asked D.Q. whether he ever saw Keepseagle hurt any of his siblings "during the pow wow or approximately a six-week period before the pow wow." R. Doc. 118-1, at 91. D.Q. answered that he saw Keepseagle "[p]unch" his "little brother AR.Q." *Id.* at 92. D.Q. stated, "I remember [Keepseagle] hitting [AR.Q.]. And I looked at him, and he looked at me. 'What are you looking at? I'll knock you out next.'" *Id.* According to D.Q., Keepseagle used his "fist" to "hit AR.Q. in the chest." *Id.* at 93. D.Q. testified that AR.Q. was "maybe three, three and a half" at the time. *Id.* at 94. D.Q. was age 13. D.Q. did not see Keepseagle hurt AY.Q. "[d]uring [the] summer before [he] [was] removed" from Archambault's and Keepseagle's home. *Id.* at 98. Neither the government nor defense counsel asked D.Q. specific questions about the porch incident.

R.Q.J. testified about Keepseagle pulling his and S.Q.'s hair during the "two-month timeframe before the pow wow." *Id.* at 108. According to R.Q.J., Keepseagle pulled his hair for approximately "a minute" while they were in the basement. *Id.* at 110. He recounted how Keepseagle repeatedly pulled his hair and picked him up and threw him down, causing him great pain and making him cry.

R.Q.J. also testified that he saw Keepseagle "hurt AR.Q. and AY.Q." "during that timeframe." *Id.* at 111. When the government asked R.Q.J. what he saw Keepseagle do to AR.Q., defense counsel objected. The district court overruled the objection, stating, "This is, as I understand it, what the indictment is based upon." *Id.* R.Q.J. then stated, "When AR.Q. was crying over something, [Keepseagle] got mad and socked him in the stomach, and AR.Q. started crying, saying he couldn't breathe." *Id.* at 112. This incident occurred "[i]n the basement." *Id.* R.Q.J. estimated that AR.Q. was "two" at the time of the incident, but he was "not sure." *Id.* R.Q.J. also testified to seeing Keepseagle "hit [AY.Q.] in the arm" with "[h]is fist" for "[p]laying around." *Id.* at 113. According to R.Q.J., this occurred in the basement in front of him and Archambault.

On cross-examination, R.Q.J. acknowledged that he had previously told the defense investigator that the accusations against Keepseagle were untrue. R.Q.J. also admitted to telling the defense investigator that Quilt "was doing things to try to get the kids to say things against [Keepseagle]," such as "bribing them with money[,] phones[,] . . . . [a]nd alcohol." *Id.* at 125–26. Additionally, R.Q.J. admitted to telling the defense investigator that Quilt was "abusing" him and had "beat" S.Q. when she mentioned Archambault. *Id.* at 126. Defense counsel also asked R.Q.J. if he recalled a conversation in which he told his grandmother and uncle that he and his siblings "were making up these allegations [against Keepseagle] because [Quilt] told [them] to." *Id.* at 129. R.Q.J. responded, "No, I don't remember." *Id.*

On redirect, the government asked R.Q.J. whether Quilt "ever [told] [him] what to say in court." *Id.* at 130. R.Q.J. responded, "Not that much." *Id.* When asked what he meant by "not that much," R.Q.J. explained, "Like, he would try to say, 'Say this.' And then he'll just go to D.Q. and tell D.Q.—whisper in his ear something." *Id.* R.Q.J. did not know what Quilt whispered to D.Q. He confirmed that he was not "listening to [Quilt]" on the day of his testimony. *Id.* Neither the government nor defense counsel asked R.Q.J. specific questions about the porch incident.

The government questioned B.Q. specifically about whether she saw Keepseagle "hurt one of [her] siblings" "during . . . the days of the pow wow." *Id.* at 165–66. B.Q. responded that she had seen Keepseagle hurt AR.Q. and AY.Q. According to B.Q., she "[s]aw [Keepseagle] throw [AR.Q.] off the porch." *Id.* at 166. Specifically, Keepseagle "grabbed [AR.Q.] and picked him up and then threw him . . . over the railing." *Id.* at 167. AR.Q. "was crying." *Id.* Likewise, B.Q. saw Keepseagle pick up AY.Q. and "throw her over the railing." *Id.* AY.Q. "was crying out loud." *Id.* B.Q. testified that she saw "scratches on [AR.Q.'s and AY.Q.'s] knees" after Keepseagle threw them. *Id.* According to B.Q., Keepseagle instructed her "not to tell anyone." *Id.* at 168. B.Q. was approximately ten years old at the time of the

incident. B.Q. testified that Quilt told her to "tell the truth" in court and did not tell her what to say. *Id.* at 171.

Following the close of the government's case, Keepseagle moved for judgment of acquittal on all counts; the district court denied the motion. Keepseagle renewed the motion at the close of his case. The district court again denied the motion.

During its closing argument, the government summarized the evidence presented as to each count. On Count I, government counsel highlighted (1) the photograph of AR.Q.'s face taken after the porch incident; (2) Charlotte's observation of AR.Q.'s red face after the porch incident; (3) Quilt's testimony about witnessing Keepseagle throw AR.Q. from the porch and observing swelling on the child's face and a bloody nose; (4) D.Q.'s "different story about how he saw AR.Q. get[ting] hit in the chest by [Keepseagle]"; (5) R.Q.J.'s observation of "Keepseagle hit[ting] AR.Q. in the stomach"; and (6) B.Q.'s observation of the porch incident. R. Doc. 125, at 19–20.

In concluding its argument, the government addressed Quilt's testimony, which "only applie[d] to the count with regard to AR.Q., the count with regard to AY.Q., and the count with regard to S.Q." *Id.* at 25. The government urged the jury to note evidence corroborating Quilt's testimony despite any misgivings it might have about him personally or about the credibility of certain things that he said. The government argued that Quilt's testimony about Keepseagle's abuse of AR.Q. and AY.Q. was corroborated by the pictures he took of their injuries, Charlotte's testimony "about red faces," and B.Q.'s testimony. *Id.* at 26.

Keepseagle's counsel, in closing argument, also addressed Counts I (AR.Q.) and II (AY.Q.). *See id.* at 31 ("In the first count, the government charges that [Keepseagle] committed one act of child abuse against AR.Q. And in Count 2 he is charged with committing one act of child abuse against AY.Q."). Because neither

child testified, counsel advised the jury that it would "have to rely on the testimony of those who did come in," beginning with Quilt's testimony. *Id.* at 32. Counsel then attacked the credibility of Quilt's testimony concerning the porch incident. He also pointed out inconsistencies in the testimonies of the various witnesses and argued those inconsistencies showed the government had not met its burden of proof.

Defense counsel then addressed the "other incidents" involving AR.Q. that the jury heard about. *Id.* at 38. Even though the government "only charg[ed] one count," "R.Q.J. talked about [Keepseagle] punching AR.Q. in the stomach" and "AY.Q. in the arm," while "D.Q. talked about [Keepseagle] punching [AR.Q.] in the chest." *Id.* at 38–39. Counsel argued that the child witnesses' testimony lacked sufficient cogency to provide the jury with a basis to conclude that Keepseagle's conduct caused them sufficient pain to meet the elements of child abuse.

The district court instructed the jury on the "four essential elements" of "[t]he crime of child abuse." R. Doc. 83, at 13–16. The first element was that "[o]n or about between June 1, 2018, and August 12, 2018, the defendant, without just cause, abused, exposed, tortured, tormented, or cruelly punished [the child]." *Id.* The court defined "abuse" as "physical maltreatment"; "torture" as "caus[ing] intense suffering or . . . punish[ing] or coerc[ing] by inflicting excruciating pain"; "torment" as "caus[ing] severe and unusually persistent or recurrent distress of body or mind"; and "cruelly punish" as "punish[ing] in such a way as to intentionally inflict physical suffering with reckless indifference to pain." *Id.* at 17. The district court also instructed the jury that its "verdicts must be unanimous." *Id.* at 23.

The jury found Keepseagle guilty on Counts I (AR.Q.), III (S.Q.), and IV (R.Q.J.) but acquitted him on Count II (AY.Q.).

## II. *Discussion*

Keepseagle raises three arguments on appeal. First, he argues that the district court plainly erred in not giving a special unanimity instruction to the jury regarding Count I (AR.Q.). Second, he asserts that the district court erred in denying his motion for judgment of acquittal on all counts. Finally, he argues that the district court erred in denying his motion for continuance.

## A. *Special Unanimity Instruction*

Keepseagle concedes that he "did not request a limiting instruction or otherwise object to the district court's instruction as to unanimity." Appellant's Br. at 16. Nonetheless, he argues that the district court plainly erred by not giving the jury a special unanimity instruction on Count I (AR.Q.). According to Keepseagle, the record evidence described three separate incidents of alleged abuse in which he threw AR.Q. from the porch, punched AR.Q. in the stomach, and punched AR.Q. in the chest. But the government only charged him with one count of abuse against AR.Q. Keepseagle contends that this "resulted in a duplicitous indictment." *Id.* at 17. While Keepseagle acknowledges that "the district court instructed the jury that its verdict on each count must be unanimous," he contends that it failed to "provide a specific instruction requiring that the jurors must be unanimous in determining which of the alleged acts Keepseagle committed." *Id.* Such an instruction would have "inform[ed] the jury that it must unanimously find [Keepseagle] guilty with respect to at least one distinct act." *Id.* In the absence of such instruction, Keepseagle argues he has "no assurance that the jury reached unanimity with regard to one specific act." *Id.*

We review for plain error Keepseagle's argument that the district court erred by not giving a specific unanimity instruction to the jury regarding Count I. *United States v. James*, 172 F.3d 588, 592 (8th Cir. 1999). "For [Keepseagle] to prevail, he 'must show that the district court committed an error that is plain, *i.e.* clear under current law, that he was prejudiced by the error, and that the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *United States v.*

*Carnes*, 22 F.4th 743, 750 (8th Cir. 2022) (quoting *United States v. Woolsey*, 759 F.3d 905, 907 (8th Cir. 2014)).

Count I of the indictment charged Keepseagle with "abus[ing], expos[ing], tortur[ing], torment[ing], and cruelly punish[ing] [AR.Q.], a child who had not attained the age of seven, in violation of 18 U.S.C. § 1153[2] and SDCL 26-10-1[3]," "[o]n or about between the 1st day of June, 2018, and the 12th day of August, 2018." R. Doc. 1-2, at 1. "[T]o establish a conviction for felony child abuse under [Count I], the government had to prove [Keepseagle], without just cause, abused, exposed, tortured, tormented, or cruelly punished [AR.Q.], []he was under seven years of age, [Keepseagle] was an Indian, and the offense took place in Indian Country." *United States v. Iron Hawk*, 612 F.3d 1031, 1036 (8th Cir. 2010) (citing S.D. Codified Laws § 26-10-1; 18 U.S.C. § 1153).

Keepseagle argues that the government presented evidence of three separate incidents in a single count of aggravated child abuse: (1) Quilt's testimony that Keepseagle threw AR.Q. from the porch, (2) D.Q.'s testimony that Keepseagle punched AR.Q. in the chest, and (3) R.Q.J.'s testimony that Keepseagle punched AR.Q. in the stomach.

---

[2]Pursuant to 18 U.S.C. § 1153(a), "[a]ny Indian who commits against the person . . . of another Indian or other person . . . felony child abuse . . . within the Indian country, shall be subject to the same law and penalties as all other persons committing . . . the . . . offense[], within the exclusive jurisdiction of the United States." The "offense [of felony child abuse] . . . shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense." *Id.* § 1153(b).

[3]Under South Dakota law, "[a]ny person who abuses, exposes, tortures, torments, or cruelly punishes a minor in a manner which does not constitute aggravated assault, is guilty of a Class 4 felony. If the victim is less than seven years of age, the person is guilty of a Class 3 felony." S.D. Codified Laws § 26-10-1.

Here, South Dakota law—"the law[] of the State in which [the] offense was committed," 18 U.S.C. § 1153(b)—provides:

> When evidence of several acts is presented at trial, any one of which could constitute the basis for the single offense charged, trial courts can take one of two actions: (1) require the prosecution to elect the transaction on which it relies for the conviction, or (2) give a unanimity instruction telling the jurors that they must unanimously agree that the defendant committed all the acts offered in evidence. Unanimity is at risk when the evidence at trial suggests more than one distinct crime or the jury has multiple offenses to consider under a single count. In these circumstances, a general verdict may not reveal whether the jury unanimously found the defendant guilty of one offense or more offenses, or guilty of one offense and not guilty of others.

*State v. White Face*, 857 N.W.2d 387, 394 (S.D. 2014) (cleaned up).

But "when the case falls within a continuing course of conduct," the aforementioned "requirements are not implicated, even though the evidence suggests more than one distinct crime." *Id.* The continuing-course-of-conduct doctrine provides that

> when the evidence establishes a pattern of physical trauma inflicted upon a child within a relatively short period of time, a single course of conduct is involved and no justification exists for departing from the well-established rule that jury unanimity is not required on the underlying conduct constituting child abuse.

*Id.* (cleaned up).

"[A]nalytical difficulty [exists] in child abuse cases . . . in determining when multiple acts constitute separate offenses and when they encompass a single offense." *Id.* "[A]ggravated child abuse under SDCL 26-10-1" is a crime for which "[j]uror

-12-

unanimity is not required when [it] . . . involves a continuous course of conduct or a series of related acts over a period of time." *Id.* The South Dakota "Legislature intended for the offense of child abuse to include both a single act of abuse, as well as a continuing course of abusive acts. Thus, a unanimity instruction in child abuse cases will be required in some instances but not others." *Id.* at 395 (footnote omitted).

A trial court must ask the following when determining whether to give a specific unanimity instruction to the jury: "(1) [whether] there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) [whether] the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime." *Id.* (internal quotation marks omitted). A trial court "should give the unanimity instruction" "[i]n the first situation, but not the second." *Id.* (internal quotation marks omitted). When evaluating the evidence, the trial court should view "the defendant's acts . . . in a commonsense manner, taking into account whether the acts occurred in a separate time frame or separate identifying place." *Id.* (internal quotation marks omitted).

In *White Face*, the South Dakota Supreme Court held that the trial "court erred by not providing the jury with a special unanimity instruction requiring it to agree on the act supporting [the defendant's] conviction [for aggravated child abuse] or [to] find that [the defendant] had committed both acts of child abuse." *Id.* at 396. The case involved "two separate and distinct incidents of abuse . . . alleged in a one-count indictment." *Id.* at 389. Specifically, the State asserted that the defendant broke his infant daughter's femur, then, four days later, smothered her. *Id.* at 394. The indictment charged the defendant "with aggravated child abuse between" this four-day period. *Id.* at 390. "During the settling of the jury instructions, defense counsel requested that the jury be instructed that they must determine guilt or innocence on each incident . . . ." *Id.* at 391. The trial court declined to give the requested instruction. *Id.* at 392. The jury found the defendant guilty on the single count of aggravated child abuse. *Id.*

On appeal, the question was whether "the trial court ha[d] a duty sua sponte to properly instruct the jury on unanimity" given that "[a] defendant has a due process right to a unanimous jury verdict." *Id.* at 393. The South Dakota Supreme Court concluded that the trial court was required to give a special unanimity instruction in the defendant's case because a risk existed that the jury would "divide on two discrete crimes and not agree on any particular crime." *Id.* at 395. The court based its decision on the absence of pattern-of-abuse evidence and the State's invitation to the jury to convict on either of the alternative incidents of abusive behavior. *Id.* The court noted that the trial court's instructions "only informed the jury that the verdict must be unanimous." *Id.* at 396. The court held that "[t]he circuit court erred by not providing the jury with a special unanimity instruction requiring it to agree on the act supporting the conviction or find that [the defendant] had committed both acts of child abuse." *Id.* As a result, the court reversed and remanded for a new trial. *Id.*

The government argues that "the evidence in this case involved a course of conduct" and that "to the extent there were multiple instances of alleged abuse against AR.Q., such evidence was presented at trial as a continuous course of conduct." Appellee's Fed. R. App. P. 28(j) Letter, at 1. We disagree. As in *White Face*, a risk existed that "the jury may divide on [multiple] discrete crimes and not agree on any particular crime." 857 N.W.2d at 395. Applying the holding of *White Face* to the instant facts, we conclude that the district court plainly erred in not giving an appropriate unanimity instruction resulting in a duplicitous indictment.

First, as in *White Face*, no evidence suggested "a pattern of continuous abuse"; instead, it described three "discrete incidents." *See id*. Quilt testified that on August 10, 2018, he witnessed Keepseagle punch AR.Q. in the face and then throw AR.Q. off the porch. By contrast, neither D.Q. nor R.Q.J. specified a date upon which they witnessed Keepseagle abuse AR.Q. D.Q. testified to seeing Keepseagle punch AR.Q. in the chest "during the pow wow *or approximately a six-week period before the pow wow*." R. Doc. 118-1, at 91 (emphasis added). D.Q. never testified about the porch

-14-

incident. Likewise, R.Q.J. did not testify about the porch incident or specify the date upon which he witnessed Keepseagle punch AR.Q. in the stomach; instead, he testified only that the incident occurred "[i]n the basement." *Id.* at 112. R.Q.J. was not sure of AR.Q.'s age at the time. *Id.* The government never offered any evidence "that the injuries inflicted upon [AR.Q.] [between June 1, 2018, and August 12, 2018,] formed a pattern of abuse or constituted battered child syndrome." *See White Face*, 857 N.W.2d at 395.

Second, just as in *White Face*, the government "invited the jury to convict on [any of the three] incident[s], . . . thus elevating the risk the jury could divide on the [three] offenses and not all agree on one particular offense." *Id.* In its closing, the government cited the following as "evidence for Count I": (1) Quilt's testimony that Keepseagle threw AR.Q. from the porch, (2) D.Q.'s testimony "about how he saw AR.Q. get hit in the chest by [Keepseagle]," and (3) R.Q.J.'s testimony "that he saw Tyson Keepseagle hit AR.Q. in the stomach." R. Doc. 125, at 19–20. Defense counsel reiterated the government's reliance on all three incidents, arguing that while the government had charged only one count, it presented evidence of "other incidents" in addition to the porch incident. *Id.* at 38. Specifically, the government presented R.Q.J.'s testimony that Keepseagle "punch[ed] AR.Q. in the stomach" and D.Q.'s testimony that he saw Keepseagle "punch[] [AR.Q.] in the chest." *Id.*

We, like the court in *White Face*, "cannot be reasonably certain that [Keepseagle] was found guilty by a unanimous jury." 857 F.3d at 396. The government presented multiple "incidents of trauma, [all] of which could have formed the basis of aggravated child abuse under SDCL 26-10-1, and the instructions given only informed the jury that the verdict must be unanimous." *Id.* The district "court erred by not providing the jury with a special unanimity instruction requiring it to agree on the act supporting the conviction or find that [Keepseagle] had committed [all three] acts of child abuse." *Id.* The district court's error was plain under *White Face*. This plain error prejudiced Keepseagle and "seriously affects the fairness,

integrity, or public reputation of judicial proceedings" because of the uncertainty whether the jury was unanimous about a specific act. *See Carnes*, 22 F.4th at 750 (quoting *Woolsey*, 759 F.3d at 907). Accordingly, we vacate Keepseagle's conviction on Count I and remand for a new trial.

### B. *Motion for Judgment of Acquittal*

Keepseagle also argues that no reasonable jury could have concluded beyond a reasonable doubt that he committed aggravated child abuse. As a result, he maintains that the district court erred in denying his motion for judgment of acquittal on all counts.

"We apply the same standard of review to the district court's ruling on a defendant's motion for judgment of acquittal as we do to challenges to the sufficiency of the evidence to support a guilty verdict." *United States v. Garcia*, 562 F.3d 947, 958 (8th Cir. 2009). "[W]e resolve all evidentiary conflicts in the Government's favor and accept all reasonable inferences from the evidence that support the jury's verdict" "[i]n reviewing the sufficiency of the evidence." *Id.* (quoting *United States v. Price*, 542 F.3d 617, 620 (8th Cir. 2008)). "[O]nly if no reasonable jury could have found [Keepseagle] guilty" will we "overturn the verdict." *Id.* (quoting *Price*, 542 F.3d at 620). Because we have already granted Keepseagle a new trial on Count I, we will only analyze the sufficiency of the evidence on Counts III and IV.

### 1. *Count III (S.Q.)*

Count III charged Keepseagle with child abuse of S.Q., in violation of South Dakota Codified Law § 26-10-1, pursuant to 18 U.S.C. § 1153. At trial, S.Q. testified about an incident that occurred around the time of the powwow when she was 11 years old in which Keepseagle got angry with her, grabbed her by the ears, and lifted her into the air.

On appeal, Keepseagle challenges S.Q.'s testimony as not credible given that no one substantiated her account.

"Appellate courts are not well-equipped to evaluate a jury's reasoning when making its credibility findings. The jury is the final arbiter of the witnesses' credibility, and we will not disturb that assessment. As such, a jury's credibility determinations are virtually unassailable on appeal." *United States v. Never Misses A Shot*, 781 F.3d 1017, 1026 (8th Cir. 2015) (cleaned up). Whether S.Q. was credible was for the jury to determine, and we will not disturb its determination. *See id*. As a result, the district court did not err in denying Keepseagle's motion for judgment of acquittal on Count III.

### 2. *Count IV (R.Q.J.)*

Count IV charged Keepseagle with child abuse of R.Q.J., in violation of South Dakota Codified Law § 26-10-1, pursuant to 18 U.S.C. § 1153. At trial, R.Q.J. testified that Keepseagle pulled his hair while they were in the basement. The hair pull lasted approximately "a minute." R. Doc. 118-1, at 110. Keepseagle "kept . . . pulling [R.Q.J.'s hair], and then [he] threw [R.Q.J.] down, and then picked [R.Q.J.] back up, and then threw [R.Q.J.] down." *Id.* The hair pull "hurt" R.Q.J., and he "started crying." *Id.* at 109–10. R.Q.J. testified that he "sat there crying" because "[t]hat hurt [his] head . . . bad." *Id.* at 111.

On appeal, Keepseagle argues that R.Q.J.'s testimony lacks credibility because (1) "[p]rior to trial, [he] confessed to a defense investigator that he and the others were being pressured by Quilt to make allegations against Keepseagle"; (2) although R.Q.J. later recanted his statement to the defense investigator, "it is difficult to ascertain from his trial testimony what exactly he recanted"; and (3) no one ever corroborated R.Q.J.'s testimony. Appellant's Br. at 12–13.

At trial, Keepseagle's counsel had the opportunity to cross-examine R.Q.J. on his recantation. It was for the jury to determine whether R.Q.J. was credible. *See Never Misses A Shot*, 781 F.3d at 1026. We will not disturb its determination.

Keepseagle additionally argues that even if he "committed the alleged act as to R.Q.J., it was not child abuse." Appellant's Br. at 13 (emphasis omitted). "[T]o establish a conviction for felony child abuse under [Count IV], the government had to prove [Keepseagle], without just cause, abused, exposed, tortured, tormented, or cruelly punished [R.Q.J.] . . . ." *Iron Hawk*, 612 F.3d at 1036. Keepseagle argues that "there was no apparent injury to R.Q.[J.] based on Keepseagle's conduct" and that R.Q.J.'s testimony that the hair pull hurt and that he cried was insufficient to "establish[] that the pain was intense or excruciating or that it was done with reckless indifference." Appellant's Br. at 15.

Keepseagle relies on both South Dakota case law and this court's precedent interpreting § 26-10-1 in support of his argument that any alleged injury that R.Q.J. suffered was not severe enough to constitute child abuse. *Id.* at 14–15 (citing *United States v. Spotted Horse*, 916 F.3d 686 (8th Cir. 2019); *United States v. White Plume*, 847 F.3d 624 (8th Cir. 2017); *Iron Hawk*, 612 F.3d at 1031; *State v. Morgan*, 824 N.W.2d 98 (S.D. 2012)).

In *Morgan*, the defendant, who was convicted of child abuse under § 26-10-1 for "grabb[ing] and squeez[ing] [the victim's] face," "argue[d] that the verdict [was] not sustained by the evidence and his actions were permissible discipline[, an affirmative defense]." 824 N.W.2d at 99, 100. The defendant's conduct had caused "extensive bruising" and other injuries to the victim's face. *Id.* at 102. After reviewing the trial testimony, the South Dakota Supreme Court held that sufficient evidence existed "from which the jury could find that [the defendant's] actions, grabbing and squeezing [the victim's] face, were not permissible discipline." *Id.*

-18-

*Morgan* is inapposite. It does not discuss the level of injury necessary to sustain a conviction under § 26-10-1, nor do any of the other cases that Keepseagle relies on.[4] Instead, the South Dakota Supreme Court in *Morgan* explained why under the specific facts of that case the evidence defeated the defendant's affirmative defense of permissible discipline and supported the jury's finding of child abuse.

Based on our review of the record, we conclude that sufficient evidence supports the jury's finding that Keepseagle "abused, exposed, tortured, tormented, or

---

[4]*Spotted Horse* involved a defendant who was convicted of assault with a dangerous weapon, in violation of 18 U.S.C. § 1153 and 113(a)(3), based on the same conduct underlying the defendant's child abuse conviction under § 26-10-1. 916 F.3d at 689. It did not concern the sufficiency of the evidence or the level of injury necessary to sustain a conviction for child abuse. *See id.* at 691–94.

*White Plume* concerned a defendant who was convicted of assault resulting in serious bodily injury, in violation of 18 U.S.C. §§ 1153 and 113(a)(6), based on the same conduct underlying the defendant's child abuse conviction under § 26-10-1. 847 F.3d at 626. The defendant challenged the sufficiency of the evidence on both counts. We held that "[t]he evidence sufficiently supports the verdicts" on both counts, citing the defendant's admission that "the injuries were severe, acute, and non-accidental" and testimony that the defendant was "alone with [the victim] immediately before the injury." *Id.* at 627. We did not discuss the level of injury necessary to sustain a conviction under § 26-10-1. *See id.*

*Iron Hawk* likewise concerned a defendant convicted of assault resulting in serious bodily injury, in violation of 18 U.S.C. § 113(a)(6), based on the same conduct underlying the defendant's child abuse conviction under § 26-10-1. 612 F.3d at 1035. The defendant argued that the evidence was insufficient to sustain both convictions. *Id.* Our sufficiency analysis focused primarily on the elements necessary to sustain the assault conviction. *Id.* at 1036. One of the elements of that conviction was that the assault "result[] in serious bodily injury" to the victim. *Id.* The defendant conceded that the victim suffered serious bodily injury but argued that insufficient evidence existed that he had caused such injury. *Id.* At no time did we discuss the level of injury required to sustain a conviction under § 26-10-1. *See id.*

-19-

cruelly punished [R.Q.J.]." *Iron Hawk*, 612 F.3d at 1036. R.Q.J. testified that Keepseagle's act of pulling R.Q.J. up by his hair and throwing him down caused him severe pain; he testified that his head "hurt . . . bad" and that he cried from the pain that Keepseagle caused. R. Doc. 118-1, at 111. The district court did not err in denying Keepseagle's motion for judgment of acquittal on Count IV.

## C. *Motion for Continuance*

Lastly, Keepseagle argues that the district court abused its discretion in denying his motion for continuance based on the reports that he received from the government on the eve of trial detailing the recent allegations against Quilt by two of the named victims. According to Keepseagle, this new information was "pertinent" to his defense and additional time to review the reports would have put him in a better position to cross-examine Quilt and the alleged victims. Appellant's Br. at 19.

We review for an abuse of discretion a district court's denial of a continuance motion. *United States v. Vesey*, 330 F.3d 1070, 1071 (8th Cir. 2003). We afford the district court broad discretion in ruling on such motion. *Id.* at 1072. "Continuances generally are not favored and should be granted only when the party requesting one has shown a compelling reason." *Id.* (quoting *United States v. Allen*, 247 F.3d 741, 771 (8th Cir. 2001)). A district court's denial of a continuance motion will only be reversed "if the court abused its discretion and the moving party was prejudiced by the denial." *Id.* (quoting *Allen*, 247 F.3d at 771).

We determine whether the district court abused its discretion "by looking at the particular circumstances of the case." *Id.* (quoting *Allen*, 247 F.3d at 771). Specifically, we ask "whether counsel had sufficient time to prepare for trial; whether counsel's conduct at trial showed that he was well prepared; and whether the court's refusal to grant a continuance prejudiced the defendant." *Id.* (cleaned up).

Answering these questions, we conclude that the district court did not abuse its discretion in denying Keepseagle's continuance motion. First, Keepseagle had over a year to prepare for trial. His investigator uncovered Quilt's alleged abusive coercion one month prior to trial. Second, the record shows that Keepseagle's counsel was well prepared to address Quilt's actions, as evidenced by his thorough cross-examination of Quilt, R.Q.J., D.Q., S.Q., and B.Q. *See United States v. Cotroneo*, 89 F.3d 510, 514 (8th Cir. 1996) (holding district court did not abuse its discretion in denying a continuance where the defendant "was represented by counsel, who cross-examined the government's witnesses at length, including questioning them with respect to" the evidence received one day before trial). Finally, Keepseagle has not identified what admissible evidence he would have offered had the district court granted his continuance motion. *Id.* ("Although counsel also referred to 'individuals and witnesses' whose presence at the hearing Cotroneo claimed he required, the record contains no suggestion as to who those persons were, why their testimony was necessary, or why their appearance had not been secured prior to the opening of the hearing.").

## III. *Conclusion*

Because the district court plainly erred in not giving a special unanimity instruction on Count I, we vacate that conviction and remand for a new trial. We affirm the district court's judgment in all other respects.

—————————————